Lester M. JOHNSON et al., Plaintiffs,

v.

Raymond W. ANDERSON et al.,
Defendants.

Civ. A. No. 4534.

United States District Court,
D. Delaware.

Feb. 7, 1974.

Paul P. Welsh, of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for plaintiffs.

Francis A. Reardon, Deputy Atty. Gen., Wilmington, Del., for defendants.

## OPINION

STAPLETON, District Judge:

The plaintiffs in this civil rights action are six inmates at the Delaware Correctional Center at Smyrna. Five are currently housed in the solitary confinement section of that institution. They allege that they have been denied due process of law; that the conditions of their incarceration constitute cruel and unusual punishment; and that their access to newspapers and magazines has been unconstitutionally abridged. The remaining plaintiff was held in the isolation section during some unspecified period in the past and makes the same arguments with respect to that confinement. Defendants are the Correctional Center, its superintendent, Raymond W. Anderson, and four members of his staff. Plaintiffs request injunctive relief and damages. Jurisdiction is conferred by 28 U.S.C. § 1343. This opinion embodies the Court's findings of fact and conclusions of law resulting from trial of the issues raised by plaintiffs' amended complaint.[1]

## I. FACTUAL BACKGROUND

This dispute arises from actions taken by the defendants in the aftermath of a brutal attack on a prison guard, Lt. Pope.

On May 7, 1973, all of the plaintiffs were housed in B block of the maximum security building at the Correctional Center. No other inmates were housed in B block at that time.[2] On that evening, Lt. Pope was assaulted in or near B block and stabbed numerous times about the chest, back and head. When Superintendent Anderson arrived at the scene of the attack, he was informed by Captain Williams that Lt. Pope had implicated five of the six plaintiffs in the assault and that Captain Williams had placed these five inmates in solitary confinement.

Superintendent Anderson initiated an investigation of the Pope incident. This investigation included an interview of Lt. Pope and the taking of a statement from him. There was some delay, of a duration unspecified in the record, before Lt. Pope's condition permitted the taking of his statement. The investigation convinced Superintendent Anderson that plaintiff Dickerson had not been involved in the assault and he was never placed in solitary confinement as a result of the incident. In the course of the investigation, the matter was referred to the Attorney General's office for possible criminal prosecution.

On May 16, 1973 Superintendent Anderson sent a written memorandum to the five plaintiffs in solitary entitled "Explanation of Transfer to Isolation Section." The memorandum read as follows:

You were placed in the Isolation Section of the Maximum Security Building on Monday, May 7, 1973 at approximately 11:00 P.M., at which time you were informed and read, by Capt. James A. Williams in the presence of other Correctional Officers, your Constitutional Rights and the reason for your transfer to the Isolation Section.[3] This is in accordance with the Rules for the Treatment of Inmates, Pages A–10 and A–11, Article #31.[4]

---

1. The trial included a viewing of the isolation section of the prison pursuant to an agreement of the parties.

2. The maximum security building is divided into three parts: general population, B block, and the "isolation punishment section." Inmate Reference Manual pp. 10–11. B block "is used to house special behavioral problems and those who cannot function in the general population." *Id.*

3. The plaintiffs deny that any explanation for their transfer was initially provided. Capt. Williams was not called by the defense and there is no competent evidence in this record to the contrary.

4. Article 31 provides:
 *Emergency Provisions*
 (1) When faced with an immediate threat to the security of safety of the institution or any of its employees or inmates, officials

The reason for your transfer to the Isolation Section of the Maximum Security Building is the alleged assault on Lt. Earl Pope and Correctional Officers Michael McCarty and Ralph Thompson. This is not a punishment measure on the part of the Center. Your case has been referred to the Attorney General's Office for further action.

The "Rules for the Treatment of Inmates in Delaware Correctional Institutions" provide a procedure for Adjustment Board hearings before a substantial punishment can be imposed.[5] The procedural rights guaranteed to an inmate under this procedure exceed the minimum safeguards required by the United States Constitution. These five plaintiffs, however, have never been afforded the opportunity of a hearing before the Adjustment Board or any other correctional officer or board.

On May 8, 1973 Superintendent Anderson gave a telephone interview to a member of the press. The newspaper account read in part as follows:

"As Anderson gave out his report, he expressed strong bitterness against any court ruling that these five prisoners deserved the same treatment given other inmates in the correctional center.

"The Warden said that they are now in the isolation section or 'the hole', and he added 'they will remain there until I am ordered to leave them out, and if I am ordered to leave them out before I think they should come out, I no longer want to be warden of this institution.'"

Superintendent Anderson acknowledged during his testimony that this was "a fair report."

On some date prior to June 12, 1973, the five plaintiffs in isolation were indicted by a grand jury as a result of the Pope incident. Because the proceedings were initiated by an indictment, no preliminary examination was held. On June 12, 1973 these plaintiffs were arraigned and pleaded not guilty. At the time of the hearing in this case they were awaiting trial on these indictments.

Following the Pope incident, the prison administration directed that a number of physical changes be made in B block. Small doors were constructed in the cell doors in B block so that guards might pass food and other items to the inmates with minimum personal contact. An additional bar gate was constructed between cell block B and the remainder of the maximum security section. While the record does not disclose when the project was commenced, there is also currently under construction a new exercise yard for use by inmates of B block. This yard will be so constructed that a guard may maintain continual surveillance from a location inside the building and inaccessible to those in the yard.

The new gate and pass-throughs were completed shortly before July 9, 1973. On July 11, 1973 Superintendent Anderson issued new rules applicable to B block. Under the pre-May 7, 1973 practice, inmates on B block, while kept segregated from general population of maximum security, were accorded the same privileges as the inmates confined there. For example, most inmates in B block had been permitted to eat together in the "day room" and had been permitted to exercise out of doors for an hour each day. Under the new rules, inmates were fed in their cells and, when permitted out of their cells for exercise and showers, were released only in groups of two or three. Inmates were permitted to exercise for one hour a day but this exercise was restricted to the cell section of the tier until such time as the new

of the institution may temporarily reassign, segregate or sequester inmates;
 (2) As soon as security permits, the inmates shall be informed in writing of the nature of the charges or reason for their assignment, segregation or sequestration and afforded their rights under these regulations.

 (3) Emergency measures shall be reported to the superintendent and the Office of the Director of the Division of Corrections.

5. See Appendix A.

yard could be completed. In addition, the regulations regarding personal belongings in a cell, commissary access, access to library books, access to legal reference works, and visitation were more restrictive than the previously prevailing practice in B block though considerably more lenient than the similar regulations in isolation.[6] These new rules were applicable to all inmates housed in the approximately sixteen cells in block B. At the time of trial there were seven inmates housed in this cell block.

On July 9, 1973 the five plaintiffs who had been confined in isolation since May 7, 1973 were transferred to cell block B. However, upon discovering that their privileges would be less than those which they enjoyed prior to May 7, 1973, they demanded to be returned to isolation. Their demand was acceded to and they have been in the isolation section since that time. Efforts by Superintendent Anderson, a social worker at the prison, and others to induce them to return to cell block B have been unfruitful.

The plaintiffs have consistently maintained that they could not properly be placed in isolation, or subjected to any conditions more severe than those existing on B block prior to May 7th, absent utilization of the procedures specified in the prison rules as a prerequisite for serious disciplinary action.

## II. THE DUE PROCESS ISSUES

Plaintiffs maintain that they have been denied due process of law in two respects. First, the five plaintiffs in isolation claim that their transfer to isolation without the opportunity for a hearing violated their rights to procedural due process. Second, all six plaintiffs claim that prison restrictions on the access of inmates in solitary confinement to legal research materials have unreasonably hindered their access to the courts in violation of their rights under the Due Process Clause.

### A. *Plaintiffs' Right To A Hearing*

■ It is now well established in this circuit as elsewhere that a citizen does not shed all of his constitutional rights at the prison gate. To determine what rights survive incarceration and how those rights have been properly affected by the state's legitimate interests in security and rehabilitation within its penal institutions involves a weighing and balancing of conflicting interests. Gittlemacker v. Prasse, 428 F.2d 1 (3rd Cir. 1970).

In striking this constitutional balance here, we are aided by several established propositions.

■ First, absent an unusual circumstance, the Due Process Clause requires that, prior to the imposition of solitary confinement, an inmate must at least be given notice of the charge against him and an opportunity to tell his side of the story. Gray v. Creamer, 465 F.2d 179 (3rd Cir. 1972); United States ex rel. Tyrrell v. Speaker, 471 F.2d 1197 (3rd Cir. 1973); Biagiarelli v. Sielaff, 483 F.2d 508 (3rd Cir. 1973); Braxton v. Carlson, 483 F.2d 933 (3rd Cir. 1973);[7]

---

**6.** Under the new rules it was suggested that additional privileges might be accorded "at a later point in time after security measures have been set up to handle it," and that existing privileges might be lost by unacceptable conduct. In practice, restrictions on such things as library access are relaxed to some degree in return for good conduct.

**7.** The Third Circuit in *Braxton* suggested that more may ordinarily be required:
 . . . [W]e agree with the Second Circuit that due process is present when facts are rationally determined in a proceeding where the prisoner (1) is notified of the accusation and informed of the [substance of the] evidence against him, and (2) is afforded a reasonable opportunity to explain his actions. (Citations omitted). Under these standards, the hearings granted appellants in this case comported with due process. As the district court found:
 Before the disciplinary committee acted
 (1) Plaintiffs received adequate notice of the charges,
 (2) Plaintiffs were informed of the substance of the evidence against them,
 (3) Plaintiffs were given an opportunity to respond, and

Sostre v. McGinnis, 442 F.2d 178 (2nd Cir. 1971); Adams v. Pate, 445 F.2d 105 (7th Cir. 1971).

■ Second, the cases are unanimous in holding that the state's legitimate interest in the security of its penal institutions is sufficiently compelling that an inmate may, consistent with due process of law, be transferred to solitary confinement summarily whenever the security of the institution so requires. See e. g., Gray v. Creamer, *supra* at n. 6; United States ex rel. Arzonica v. Scheipe, 474 F.2d 720 (3rd Cir. 1973); Biagiarelli v. Sielaff, *supra*; Braxton v. Carlson, *supra*.

■ Third, the existence of exigent circumstances which permit the state to summarily subject an inmate to the added privations of solitary confinement does not relieve the state of the responsibility of providing at a later time the procedures that the Constitution would otherwise require prior to the imposition of the new status. Said more simply, when the reason for the emergency exception to the hearing requirement is no longer apposite, the exception is no longer apposite. If, after the emergency which gave rise to the inmate's reassignment passes, the inmate is to be kept in his new status, notice of charges and an opportunity to respond are required. Urbano v. McCorkle, 334 F.Supp. 161 (D.N.J.1971). The test of when this right arises is one of reasonableness under all the circumstances of the case.

Braxton v. Carlson, 483 F.2d 933 (3rd Cir. 1973).

Here there concededly has been no hearing or other opportunity for the plaintiffs to rebut the charges for which they were confined in isolation.[8] Nor has it been contended that the emergency situation which was the precipitating cause of plaintiffs' transfer continued for any substantial period following their confinement.[9] Instead, the defendants offer three reasons why their failure to provide a hearing was reasonable in this case. None of these reasons is sufficient to outweigh the plaintiffs' right to an opportunity to tell their side of the story.

■ Initially, the defendants say that the plaintiffs were placed in isolation for security reasons and not as a punitive measure and that, therefore, no requirement for a fair procedure arose. This argument is neither factually nor legally sound. While security considerations undoubtedly played a part in Superintendent Anderson's decision, I conclude from the evidence that he became convinced of the plaintiffs' participation in the assault and determined that isolation would be the appropriate administrative response. His understandably emotional press interview evidences his view that the plaintiffs' conduct warranted their dispatch to "the hole."[10] The "no punishment" approach taken by the Superintendent in his May 16th notice was the product, I conclude, of a be-

---

(4) The Committee made a reasonable investigation into the facts.
340 F.Supp. [999] at 1002.
In *Biagiarelli*, decided a month earlier, however, the court held that in some circumstances an inmate may have no right to "a statement of the evidence."

8. In this section of the opinion, I refer solely to the five plaintiffs currently housed in the isolation section. There is insufficient information in the record to make any determination with respect to the circumstances of plaintiff Dickerson's earlier confinement.

9. The defendants do contend that the conditions existing immediately after the attack

justified their summary action in placing the five inmates in solitary and that, given the need for investigation and consultation, the nine day delay in giving written notice of the reason for transfer was reasonable. Summary action was clearly warranted and I am unwilling to hold on the basis of the current record that the notice was too long delayed. The exigencies of the circumstances on May 7th and from that day to May 16th do not, however, aid the defendants with respect to the period between May 16th and July 9th.

10. In context, I do not read the reference in the interview to unequal treatment to be directed to procedural rights.

lief on his part that formal disciplinary proceedings might create "double jeopardy" problems in any subsequent criminal proceedings. While this belief was erroneous as hereafter indicated, I am persuaded that it was the reason for the failure to accord the plaintiffs their procedural rights.

██ Moreover, even if the imposition of solitary confinement had not been intended in part as punishment, this would not dispel the due process problem. The Due Process Clause requires fundamental fairness whenever there may be a substantial deprivation, regardless of the label used to characterize the contemplated action.[11] It requires no great insight to appreciate that the "grievous loss," Joint Anti-Facist Refugee Committee v. McGrath, 341 U.S. 123, 168, 71 S.Ct. 624, 95 L.Ed. 817 (1951), suffered by an inmate upon his confinement in isolation is felt by him to be no less grievous when he is told that he is not being punished. Reasons of security or other legitimate penal interests may justify restrictive confinement or other sanctions, but where the sanction imposes a substantial deprivation upon an inmate, it may not, absent unusual circumstances, be imposed without affording the inmate a fair opportunity to rebut the factual basis for the decision to change his status. The wisdom of the rule is aptly illustrated by the facts of this case. A brutal attack had been made upon a guard; at least six inmates had access to the guard at the time of the attack. The Superintendent made a judgment, based on the facts disclosed in his investigation of the matter, as to the number and identity of the assailants. Five inmates were selected for confinement in isolation. While the information available to the Superintendent may have been compelling, he nevertheless engaged in a process of attempting to reconstruct a historical event which he did not witness; the possibility of a factual error is always present in such an enterprise. The procedural safeguards required by the Constitution cannot be dispensed with solely because the risk of error in a particular situation may seem slight to the official responsible for handling it.

The second and associated reason offered by Superintendent Anderson in support of the reasonability of his action is that, at the time of the attack, no facility other than isolation was available where these inmates could be housed with safety. The defendants stressed that as soon as physical adjustments were made to B block which permitted their incarceration there with safety, these plaintiffs were afforded the chance to transfer there.

██ It exhibits no lack of appreciation for the dangerous situation existing in the prison on May 7, 1973 to say that this argument misses the point. There is nothing in the Constitution which prevents these inmates from being held in solitary confinement whenever security or some other legitimate interest of the state so requires. What is required is that the inmates subjected to solitary confinement be given fair notice of their offense and a chance to respond. The determination that additional security was necessary for these five inmates resulted from the Superintendent's conclusion that they had participated in the stabbing; similar measures were not taken with respect to plaintiff Dickerson. To say that there was no need for a hearing because there was in any case no adequate place to which to transfer the plaintiffs assumes that which the

---

11. See Biagiarelli v. Sielaff, 483 F.2d 508 (3rd Cir. 1973); Sostre v. McGinnis, 442 F.2d 178, 198 (2nd Cir. 1971); Nolan v. Scafati, 430 F.2d 548, 550 (1st Cir. 1970); Howard v. Smyth, 365 F.2d 428, 429 (4th Cir. 1966); Landman v. Royster, 333 F.Supp. 621, 645 (E.D.Va.1971); United States ex rel. Walker v. Mancusi, 338 F.Supp. 311, 319 (W.D.N.Y. 1971) aff'd. 467 F.2d 51 (2nd Cir. 1972); Allen v. Nelson, 354 F.Supp. 505, 511 (N.D. Cal.1973); Urbano v. McCorkle, 334 F.Supp. 161, 168 (D.N.J.1971); Bundy v. Cannon, 328 F.Supp. 165 (D.Md.1971); Kritsky v. McGinnis, 313 F.Supp. 1247 (N.D.N.Y.1970). But cf. Courtney v. Bishop, 409 F.2d 1185 (8th Cir. 1969).

hearing requirement is meant to fairly determine: whether each of these plaintiffs participated in the attack upon Lt. Pope. If each had, the Constitution would not require their removal from isolation;[12] if one of them had not, there was no need to subject him to the more restrictive confinement of isolation.

Finally, it is asserted that no hearing was held because it was feared that any administrative sanction imposed for the attack might create a double jeopardy effect in a later criminal prosecution based on the same incident. As previously indicated, I am convinced that this fear in fact existed and was the actual cause of the failure to provide the plaintiffs with an opportunity to be heard. It is, however, not a sufficient excuse in law. Many cases have held that administrative discipline of a prisoner does not foreclose later criminal prosecution arising from the same event.[13]

On the facts of this case, it is clear that an emergency situation existed in the prison on May 7, 1973 and that no prior hearing was required before the plaintiffs could constitutionally be committed to isolation. There was, however, a need for a hearing within a reasonable time following restoration of order in the prison and completion of the investigation. Certainly there is nothing in this record which suggests that the plaintiffs could not have been given an opportunity to respond to the charge by May 16, 1973.

This Court cannot, however, conclude from this finding that the plaintiffs are currently being held in solitary confinement in violation of law. As indicated above, the plaintiffs were returned to B block, albeit a modified B block, on July 9, 1973 and elected not to remain there. While they argue that the conditions on the modified B block represented a substantial loss of their prior privileges and could not lawfully be imposed without due process, I disagree. I assume for purposes of this analysis, but do not decide, that the change in the conditions of confinement from the old B block to the adjusted B block constituted such a deprivation of privileges that, if directed at specified persons, due process safeguards would be required. Palmigiano v. Baxter, 487 F.2d 1280 (1st Cir. 1973); United States ex rel. Neal v. Wolfe, 346 F.Supp. 569 (S.D.N.Y.1972). However, the constitutional requirement that an inmate forced to suffer a substantial deprivation be afforded an opportunity to make an informed response to the charge against him is firmly rooted in an appreciation of the practicalities of prison discipline. The inmate must be given some opportunity to respond because he will be uniquely affected by the imposition of the punishment and because he is in the best position to give relevant information regarding the charge.

Neither of these reasons underlying the hearing requirement is present where, as here, an administrator implements a rule change of general applicability affecting an entire class of prisoners. Since such a rule change is not directed at particular persons, individual prisoners are neither more acutely affected by it than other members of their class nor uniquely able to bring personal knowledge to bear on the appropriateness of its implementation. Of course, cases may arise where punishment of identified individuals is effected through the guise of a general rule. Mere characterization of an action as a rule in such a context would not operate

12. Ford v. Board of Managers, 407 F.2d 937 (3rd Cir. 1969); Adams v. Pate, 445 F.2d 105 (7th Cir. 1971); Burns v. Swenson; 430 F. 2d 771 (8th Cir. 1970); Graham v. Willingham, 384 F.2d 367 (10th Cir. 1967).

13. See e. g., Patterson v. United States, 183 F.2d 237 (4th Cir.) cert. denied 340 U.S. 893, 71 S.Ct. 200, 95 L.Ed. 647 (1950); United States v. Cordova, 414 F.2d 277 (5th Cir. 1969); Keaveny v. United States, 405 F.2d 821 (5th Cir. 1969); Mullican v. United States, 252 F.2d 398, 70 A.L.R.2d 1217 (5th Cir. 1958); United States v. Shapiro, 383 F.2d 680 (7th Cir. 1967).

to deprive an inmate of his right to due process. But that clearly is not this case.

 I accept Superintendent Anderson's testimony that the Pope incident convinced him that more stringent security measures had to be taken on B block. That decision was based on the known fact of the assault; identity of the assailants was irrelevant. He directed physical changes which are now largely completed. He also amended the rules applicable to B block to minimize the exposure of guards to inmates outside of their cells.[14] This Court finds no fault with the Superintendent's actions. All inmates presently on B block are subject to a more rigorous confinement than prevailed prior to May 7, 1973. The evidence clearly establishes that these changes were not directed specifically at these plaintiffs. I therefore, conclude that no hearing was required before these plaintiffs could be subjected to the changed conditions on B block. It follows that, once the plaintiffs received the option to transfer to the modified B block, the unconstitutionality of their confinement ceased, for that confinement then became voluntary rather than compulsory. Accordingly I hold that plaintiffs were held in solitary confinement unlawfully only for the period from May 16, 1973 until July 9, 1973, the date on which they were given the power to transfer to B block.

### B. Access To Legal Materials

As a condition of their present confinement, plaintiffs are permitted only narrowly limited access to the law books available from the prison library. In isolation, an inmate is permitted access to a single law book of his choosing on two occasions during the week. The book "comes at one o'clock and . . . has to be returned at two-thirty [or] three o'clock." Other inmates enjoy substantially freer access to law books. Plaintiffs contend that, by so severely restricting their access to law books, defendants have unconstitutionally obstructed their access to the courts.

The courts have been justifiably concerned that effective access to their jurisdiction not be unreasonably impaired.[15] In a real sense, the right to petition a court for redress of grievances is the right upon which the integrity of every other constitutional right necessarily rests. Cruz v. Hauck, 475 F.2d 475 (5th Cir. 1973); VanErmen v. Schmidt, 343 F.Supp. 377 (E.D.Wis. 1972). This right of petition has been held to carry with it concomitant right of access to law books. Younger v. Gilmore, 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed. 2d 142 (1971); DeWitt v. Pail, 366 F. 2d 682 (9th Cir. 1966); Cruz v. Hauck, *supra*; VanErmen v. Schmidt, *supra*. *Cf.* Gittlemacker v. Prasse, *supra*.[16]

14. It is true, as plaintiffs stress, that some of the added restrictions were not directly related to security. This is not, however, a fatal defect. Other legitimate goals of the prison administration are served by the maintenance of a system of rewards and punishments within which the rehabilitative process will, hopefully, occur. Rules, such as these, of general applicability offer no occasion for federal courts to review the discretionary judgment of prison administrators as to what restrictions will best serve those goals.

15. The right of a state prisoner to access to the courts was first recognized by the Supreme Court in Ex parte Hull, 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941). There the court held that "the state and its officers may not abridge or impair petitioner's right to apply to a federal court for a writ of habeas corpus." In order that this right be assured all inmates, the court more recently has struck down a prison regulation forbidding an inmate from assisting another in the preparation of legal materials. Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969). Later cases have held that the right of access to the courts comprehends civil actions for redress of constitutional deprivations as well as collateral attacks on criminal judgments. See e. g., Nolan v. Scafati, 430 F.2d 548 (1st Cir. 1970); Gilmore v. Lynch, 319 F.Supp. 105 (N.D.Cal.1970) aff'd. sub nom. Younger v. Gilmore, 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971).

16. This recognition is predicated upon a judgment that the power of inmates to correspond freely with courts is not alone sufficient to fully protect their right to effectively petition

Judge Aldisert has outlined the standard against which impairments of that right must be tested:

> Access to the courts is guaranteed by the due process clause of the Fourteenth Amendment. But prison regulations which reasonably limit the times, places, and manner in which inmates may engage in legal research and preparation of legal papers do not transgress this constitutional protection so long as the regulations do not frustrate this access.

Gittlemacker v. Prasse, *supra*, 428 F.2d at 7.

To say, therefore, that some access to the courts is available does not resolve the question; the Court is further required to determine if the limitations on that access are reasonable. This determination requires a balancing which a leading case has clearly described:

> In most cases, however, the basic test remains the same: the asserted interest of the State in enforcing its rules is balanced against the claimed right of the prisoner and the degree to which it has been infringed by the challenged rule.

Gilmore v. Lynch, 319 F.Supp. 105, 109 (N.D.Cal.1970) aff'd. sub nom. Younger v. Gilmore, 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971).

A number of legitimate interests may be asserted by a state to support a limitation on the use of available research materials. For example, regulations which provide a fair allocation of limited library resources to all inmates, or regulations which respond to legitimate safety, security or administrative requirements of the institution manifestly seek to protect legitimate state interests. Such interests are not asserted in this case, however.[17] On this record, the only inference which can be drawn concerning the purpose of the special isolation section restrictions is that they are intended to make the conditions of an inmate's incarceration in isolation more onerous.

Within the broad limits set by the Eighth Amendment, a state may legitimately make an inmate's confinement progressively more onerous in response to his breach of prison rules, and may, contrariwise, make his conditions of confinement more pleasant in response to good behavior. I do not believe, however, that the state's interest in imposing such a system of rewards and punishment can alone justify the heavy burden which the challenged rule places on the right of those confined in solitary to seek redress of alleged grievances. Effective access to the courts is simply too crucial a right to be awarded or

---

the courts. In the *Gilmore* case, affirmed by the Supreme Court in a *per curiam* opinion, the lower court noted:

> The State answers that the needs of a criminal lawyer are not comparable to those of an inmate, since no legal expertise is required of a prisoner asking for judicial relief. All the convicted felon need do is file a brief statement of the facts of his case. If these facts state a colorable ground for relief, an attorney will be appointed to argue the case. . . .
> . . . [T]his Court takes notice that more than simple "facts" are needed in order to file an adequate petition for relief by way of habeas corpus. A prisoner should know the rules concerning venue, jurisdiction, exhaustion of remedies, and proper parties respondent. He should know *which* facts are legally significant, and merit presentation to the Court, and which are irrelevant or confusing. . . .

319 F.Supp. 105, 110. See also Johnson v. Avery, *supra*, 393 U.S. at 487, 89 S.Ct. 747.

17. It is significant that all other inmates in the maximum security building depend upon a carrier service to receive books from the prison library. Given the limited number of solitary confinement cells and their proximity to cells already served by some book delivery system, it is understandable why the state did not assert an interest in conserving prison manpower to support the restriction here challenged.

I have no occasion here to attempt to catalog the legitimate interests—such as physical protection of the books themselves—that a state may reasonably assert to support a restriction on access to law books. There is no evidence of misuse of legal materials in this record.

withheld as a disciplinary tool. This is particularly so when an inmate is confined in solitary and effectively cut-off from all but his custodians.

The access to legal reference materials afforded to the inmates in B block appears to be reasonable. No state interest other than discipline has been asserted to justify the substantially more restrictive rules governing the access of those in the adjacent cell block. That rule holds the potential of frustrating the right to effective court access when that right is most needed. Under these circumstances, I hold that the state's interest in imposing disciplinary sanctions is insufficient to justify the rule.

 While I hold that the law book restriction placed on the five plaintiffs held in solitary confinement violated their right to due process during the period preceding July 9, 1973, I do not suggest that access to legal research materials is required in all circumstances. Access to law books is a derivative right. It is not constitutionally required if effective access to the courts is assured by other means. *Cf.* Johnson v. Avery, *supra*; Gilmore v. Lynch, *supra*. If inmates have effective access to the assistance of an attorney, for example, the state need not provide facilities for inmates to do their own research.

 The State of Delaware currently provides counsel to anyone accused of a crime who is financially unable to retain his own attorney.[18] This record does not disclose, however, that legal advice is available to an inmate who seeks to vindicate a constitutional right in a civil proceeding. While an inmate's manual received in evidence recommends that an inmate needing help on a "civil matter" contact Community Law Serv-

ice or the Legal Aid Society through his counsel, no evidence was offered to demonstrate that these programs adequately serve the inmate's needs in this area. This Court's past experience with prisoner petitions would strongly suggest that the avenue recommended by the manual is not currently a realistic alternative.[19] But, in any event, the burden of proving that other available sources of legal assistance rendered the challenged rule reasonable was upon the defense. Johnson v. Avery, *supra* 393 U.S. at 489, 89 S.Ct. 747; Novak v. Beto, 453 F.2d 661, 664 (5th Cir. 1971). That burden was not carried.

### III. CRUEL AND UNUSUAL PUNISHMENT

The five plaintiffs assert that a number of the conditions of their confinement in the isolation section combine to deprive them of their Eighth Amendment right to be free from cruel and unusual punishment. Specifically, they complain about the size and barrenness of the cells, inadequate lighting, bedding and medical care, insufficient access to reading material, extreme temperatures, absence of opportunity for exercise, lack of visitation privileges, and inability to immediately flush bodily wastes. Finally, they allege that they have been the objects of assaults by guards and that they were deprived of all clothing for a substantial period when they were originally placed in solitary confinement.

It is valuable at the outset to set forth the essential features of the plaintiffs' confinement. The cells in the isolation section of the Smyrna institution have a number of attributes in common with the cells in the remainder of the institution. They are identical in size (i. e. 6' by 10'4"). They are dry and clean [20] and are heated by the same central sys-

---

18. Each of the five plaintiffs is represented by court appointed counsel in the criminal proceedings relating to the Pope incident.

19. The vast majority of Section 1983 and habeas corpus cases filed in this Court by inmates at the Delaware Correctional Center are filed *pro se* and request the appointment

of counsel. This suit was itself filed *pro se*. Counsel was thereafter appointed by the Court.

20. The inmates in isolation are provided twice weekly with the necessary implements to mop and clean their cells.

tem. They have the same size exterior windows which admit a substantial amount of daylight, and they are equipped with a toilet and wash basin.

The cells of the isolation area are distinguishable from the others, however, in a number of respects. The cells in the remainder of the institution are equipped with a cot, a table surface braced to the wall, and a radio. They are lighted by two small fluorescent light fixtures. The toilet may be operated manually by the inmate at will. In isolation, the bedding consists of a five inch thick foam rubber mattress placed on a concrete foundation (approximately 6′ by 3′) which rises six inches from the surface of the floor. There is no table surface and no radio. Lighting is supplied by a single 100 watt bulb encased behind a heavy metal grill. The toilets cannot be operated manually; they flush automatically every four hours. Unlike the remainder of the cells, the door of an isolation cell has no window but is equipped with a small pass-through door.

The inmates in the isolation section do not enjoy many of the privileges available to the general prison population. There is no visitation. Face-to-face contact[21] with others is limited to guards, the prison physician, and the social worker who makes a weekly visit. There is no opportunity for any exercise other than calisthenics in one's cell.[22]

Inmates in isolation are issued soap, a toothbrush, toothpaste, a wash cloth, a towel, two sheets, blankets (one in summer, two in winter), shoes, socks, underclothing, coveralls and a jacket (winter only). No other personal belongings are permitted. Magazines and newspapers are likewise forbidden and there is no access to library books. There are no commissary privileges. As previously stated, legal reference books may be obtained on a very limited basis.

■ The many recent cases that have applied the Eighth Amendment in the prison setting all agree that, in itself, solitary confinement is a legitimate tool of prison discipline and that the validity of any particular form of solitary confinement depends on the harshness of the conditions to which it subjects the inmate.[23] Like any other punishment challenged under the amendment, the conditions of any particular solitary confinement must be measured against what the Supreme Court has termed "the evolving standards of decency that mark the progress of a maturing society." Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958). The test is whether those conditions offends the conscience of contemporary society.[24] In applying this general standard, the courts have noted three specific factors as significant: the hardship and deprivation inflicted by the confinement, its

---

21. It is possible to communicate verbally with other inmates in adjoining cells.

22. Exercise on the tier was tried at one time, but discontinued as a result of property damage inflicted by inmates when released from their cells.

23. E. g., Sostre v. McGinnis, 442 F.2d 178, 192 (2nd Cir. 1971); Krist v. Smith, 439 F.2d 146 (5th Cir. 1971); Burns v. Swenson, 430 F.2d 771 (8th Cir. 1970); Graham v. Willingham, 384 F.2d 367 (10th Cir. 1967); Novak v. Beto, 453 F.2d 661 (5th Cir. 1972); Ford v. Board of Managers, 407 F.2d 937 (3rd Cir. 1969); United States ex rel. Knight v. Ragan, 337 F.2d 425 (7th Cir. 1964).

24. In the prison setting, punishments have been forbidden under the Eighth Amendment

when they must be characterized as "unconscionable." As the Second Circuit has observed: "(W)e have in the past declined to find an Eighth Amendment violation unless the punishment can properly be termed "barbarous" or "shocking to the conscience." Sostre v. McGinnis, 442 F.2d 178, 191 (1971).

See also Burns v. Swenson, 430 F.2d 771 (8th Cir. 1970) ("base, inhuman, and barbaric"); Hancock v. Avery, 301 F.Supp. 786, 791–792 (M.D.Tenn.1969) ("barbaric", "debasing", "violates basic standards of human decency"); Holt v. Sarver, 309 F.Supp. 362, 380 (E.D.Ark.1970) ("grossly excessive", "shocking or disgusting"); Jordan v. Fitzharris, 257 F.Supp. 674 (N.D.Cal.1966) ("shocking and debased" conditions justify court's intervention to "restore the primal rules of a civilized community").

duration, and the seriousness of the infraction of prison rules for which it was imposed.

To date, solitary confinement has been held to violate the Eighth Amendment primarily when it has resulted in severe physical hardship and deprivation. The courts have repeatedly condemned solitary confinement which denies inmates the rudiments of personal hygiene, which poses an acute danger to their health by subjecting them to overcrowded conditions of habitation, an inadequate diet, improper clothing, insufficient medical attention or excessive heat or cold, or which imposes upon them such physical indignities as repeated corporal punishment or nudity.[25] While aware that more subtle forms of punishment, psychological in nature, may also offend the Eighth Amendment's guarantee of civilized treatment,[26] the courts have generally been more tolerant of the non-physical deprivations associated with solitary confinement. Accordingly, the isolation from companionship, severe restriction on intellectual stimulation and prolonged inactivity an inmate in solitary may often experience have generally escaped Eighth Amendment censure.[27] The judicial reluctance to forbid these deprivations derives, at least in part, from a recognition of the important role which a carefully graduated and controlled scheme of deprivations and rewards plays in regulating inmate conduct.[28]

The duration of an inmate's confinement, while not itself a controlling factor in Eighth Amendment analysis, nonetheless helps to gauge the cumulative burden of the deprivations that the inmate has endured. A relatively short exposure to harsh conditions is less onerous than a protracted exposure, and courts have, therefore, looked to the length, as well as the severity, of solitary confinement as one element of its constitutional validity.[29]

The third factor employed by the courts—the seriousness of the inmate's disciplinary infraction—derives from the Eighth Amendment doctrine,

25. *E. g.*, Wright v. McMann, 387 F.2d 519, 521 (2nd Cir. 1967) (complaint alleged cell encrusted with excrement; plaintiff entirely naked 11 days, then clad only in thin underwear; windows open throughout subfreezing night; prisoner slept on floor; no soap, towel or toilet paper); Hancock v. Avery, 301 F. Supp. 786 (M.D.Tenn.1969) (virtually no light or ventilation; hole for wastes flushed irregularly by guards; no soap, towel or toilet paper; two meals of bread, one full meal); Jordan v. Fitzharris, 257 F.Supp. 674 (N.D.Cal.1966) (conditions similar to *Hancock* and in addition prisoner slept naked on concrete floor); Holt v. Sarver, 300 F.Supp. 825 (E.D.Ark.1969) (isolation cells dirty and unsanitary, pervaded with bad odors; plain cotton mattresses uncovered and dirty; conducive to spreading, and did spread, infectious diseases); Landman v. Royster, 333 F. Supp. 621 (E.D.Va.1971) (prisoners kept nude in unheated overcrowded cells in winter, placed on bread and water diet, put in chains and handcuffs); Knuckles v. Prasse, 302 F.Supp. 1036, 1061, (E.D.Pa.1969) (prisoners kept nude in unlit, overcrowded, foul smelling cells for two and a half days).

26. "In this Orwellian age, punishment that endangers sanity, no less than physical injury by the strap, is prohibited by the Constitu-

tion." Sostre v. McGinnis, *supra*, 442 F.2d at 208 (Dissenting Opinion).

27. Holding constitutional psychological deprivations are: Breeden v. Jackson, 457 F.2d 578 (4th Cir. 1972) (limited recreational and exercise opportunities); Krist v. Smith, 309 F.Supp. 497 (S.D.Ga.1970), aff'd. 439 F.2d 146 (5th Cir. 1971) (lack of exercise and library access); Knuckles v. Prasse, *supra*, (no visitation rights, lack of exercise); Sostre v. McGinnis, *supra*, (isolation from other inmates, severe restrictions on access to reading material).

28. *Cf.* the discussion by the Second Circuit of the behavioral goals which the loss of privileges in solitary confinement seeks to promote, Sostre v. McGinnis, *supra*, 442 F.2d at 193, n. 23; See also the discussion of the regulation of privileges in Allen v. Nelson, 354 F.Supp. 505, 511–512 (N.D.Cal.1973) and Landman v. Royster, *supra*, 333 F.Supp. at 657.

29. *E. g.*, Allen v. Nelson, *supra*, 354 F.Supp. at 507; Howard v. Smyth, 365 F.2d 428 (4th Cir. 1966); Fulwood v. Clemmer, 206 F.Supp. 370, 379 (D.C.D.C.1962); and In Re Hutch, 23 Cal.App.3d 337, 100 Cal.Rptr. 124 (1972).

announced by the Supreme Court in Weems v. United States, 217 U.S. 349, 368, 30 S.Ct. 544, 54 L.Ed. 793 (1910), that a punishment disproportionate to the offense is cruel and unusual.[30] Accordingly, lengthy and arduous solitary confinement, imposed for a comparatively trivial infraction, requires closer scrutiny than equivalent punishment imposed for major breaches of prison discipline. To determine whether a particular form of solitary confinement is disproportionate in severity to the inmate's misconduct, the Court must necessarily examine the goals and needs of the prison administration and inquire whether the deprivations imposed by that administration are "related to some valid penal objective." Landman v. Royster, 333 F.Supp. 621, 645 (E.D.Va. 1971).[31]

■ There can be little argument that the conditions of solitary confinement endured by the plaintiffs in this case were extremely unpleasant. Under the foregoing tests, however, I cannot agree that they rise to the level of an Eighth Amendment violation.

An examination of the plaintiffs' living conditions indicates that they have received everything necessary to maintain their physical well-being and most of the purely physical amenities enjoyed by the general prison population. Their cells are neither overcrowded, unhygienic,[32] nor inadequately lit. Ample provision is made for the plaintiffs' personal hygiene. Their diet is not substandard, and they are properly clothed. While their bedding differs from that of other inmates, it is adequate for its purpose.

Although the plaintiffs have complained about excessively low temperatures, the testimony at trial revealed that temperature control is a problem that prevails throughout the institution because of its structural defects, and that corrective measures have been and will continue to be taken. No evidence suggests that temperatures have been so low as to constitute a hazard to the health of the plaintiffs or any other inmates.

Similarly, no evidence has been adduced to substantiate the plaintiffs' charges that they have received inadequate medical attention. The plaintiffs have had regular access to the prison's medical staff and have offered no competent evidence that the medical care provided is substandard.

Two of the charges relating to plaintiffs' physical treatment are sufficiently serious to warrant special comment. First, the record establishes that when the plaintiffs were first placed in solitary confinement sometime during the evening ("at nighttime") on May 7, 1973 they were stripped and searched in accordance with standard prison procedure. Of this measure, there can clearly be no criticism. The plaintiffs were left in the nude, however, until between 4:00 and 5:00 A.M. on May 8, 1973.

30. Employing this test are: Sostre v. McGinnis, supra 442 F.2d at 194; Landman v. Royster, supra, 333 F.Supp. at 646; Allen v. Nelson, supra 354 F.Supp. at 510. See generally, Wheeler, "Toward a Theory of Limited Punishment—An Examination of the Eighth Amendment," 24 Stan.L.Rev. 838 (1972).

31. A corollary principle is that solitary confinement which is arbitrary, capricious or discriminatory, or which is imposed in retaliation for the inmate's exercise of his constitutional rights is cruel and unusual punishment. E. g., Sostre v. McGinnis, supra; Fulwood v. Clemmer, supra; Roberts v. Pegelow, 313 F.2d 548, 550–551 (4th Cir. 1963).

32. The only room for argument on this score involves the four hour cycle of the automatic flush toilets. This timing is the result of an adjustment made following complaints from inmates about interruptions of sleep during a prior period when one of the nine units in isolation flushed every few minutes. Although the new system is responsive to these complaints, it results in inmates being exposed to their own wastes for substantial periods of time, which may include mealtimes. While no justification was offered for what clearly appears to be a highly undesirable over-compensation, I am unable to say that this condition, when examined in conjunction with the otherwise acceptable conditions of plaintiffs' confinement, constitutes cruel and unusual punishment.

Enforced nudity of an inmate, other than for his own protection, poses serious Eighth Amendment problems. As a disciplinary tool, it holds the potential of destroying "completely the spirit and . . . [undermining] the sanity of the prisoner." [33] For this reason, the courts have held enforced nudity for substantial periods of time and enforced nudity accompanied by other dehumanizing conditions to be proscribed by the Eighth Amendment. I conclude, however, that these precedents are inapposite here.[34] The limited duration of the episode, its location, and the season indicate that there was no serious threat to plaintiffs' physical well-being. While the time frame also suggests that the psychological impact was not severe, I recognize that nudity deliberately inflicted on an inmate has a degrading affect regardless of its duration and thus should not be judged on the basis of time alone. If this Court were satisfied that the plaintiffs were intentionally subjected to nudity for the purpose of punishment and humiliation, the Eighth Amendment question would be a far different one. The record, however, is consistent with a different thesis.

When the plaintiffs were first placed in solitary confinement, the night staff of the institution was confronted with a grave emergency situation. A gang attack on a guard may turn out to be an isolated episode or part of a more general design. Even if the former, it might spawn other disturbances. Tasks which under other circumstances would be routine may go unattended for some time without malicious intent. Here the standard coverall garb worn by those in isolation was not obtained and supplied to the plaintiffs until the early morning hours. The delay was regrettable but was not shown to be purposeful. The overall circumstances suggest an administrative oversight rather than a conscious attempt to degrade the plaintiffs.[35]

It follows that the episode of which plaintiffs complain must be evaluated outside of a punitive context. When so viewed, the deprivation of clothing during a portion of a single night did not produce the kind of injury to the mind, body or spirit against which the framers of the Eighth Amendment sought to guard.

Second, plaintiffs' charge that they have been threatened with, and occasionally subjected to, physical assaults and tear gassing by prison guards. In all, the Court has heard testimony about five such incidents which occurred at various times during the period from November of 1972 to December of 1973. In no instance was serious injury inflicted on an inmate. On three occasions the inmate involved was either on his way to Court or out of his cell for some other purpose. In at least three instances, the episode was initiated by abusive language from an inmate.

The Court makes these observations about the circumstances surrounding these episodes not by way of justification for the actions of the staff. It may well be that one or more of these episodes involved unnecessary force. Verbal abuse, unaccompanied by other behavior creating a hazard to security, does not justify physical retaliation by a prison guard. Nevertheless, the overall

33. Wright v. McMann, 387 F.2d 519, 526 (2nd Cir. 1967).

34. In the cases which hold enforced nudity unconstitutional, that nudity either continued for far longer than here, or was accompanied by other conditions not present in this record. See e. g., Knuckles v. Prasse, *supra* (two and a half day period of nudity, coupled with overcrowded, unlit, unhygienic cells) ; Landman v. Royster, *supra* 333 F.Supp. at 648

(nudity condemned only when a danger to the prisoner's health) ; Wright v. McMann, *supra* 387 F.2d at 521 (nudity continued for 11 days in filthy cells under subfreezing temperatures).

35. One doubts, for example, that a staff acting with punishment motivation would have remedied the situation between 4:00 and 5:00 A.M.

context indicates that the five occurrences complained of were not a part of any systematic application of force as a form of punishment. Nor has persuasive evidence been presented to indicate that excessive physical force is encouraged or tolerated by the prison officialdom or that these five episodes represent anything other than isolated and aberrational incidents. If undue corporal punishment were an established and recurring feature of the prison regime, there would be cause for searching Eighth Amendment scrutiny.[36] But where, as here, isolated prison guards may have overstepped the bounds of moderation, the proper remedy is not one founded on the Eighth Amendment but a civil action for assault.

■ The major difference between the plaintiffs' plight in solitary confinement and the plight of the general prison population lies in the privileges available to other inmates but withdrawn from the plaintiffs. The plaintiffs do not have: a radio, magazines or other similar contact with the outside world; an opportunity to exercise or otherwise leave their cells except for a twice weekly period for showering; an opportunity for face-to-face communication with other inmates or visitors; access to movies or television; or access to any non-legal reading matter.

Undoubtedly, these conditions have caused the plaintiffs to live a monotonous and bleak existence. The plaintiffs have presented no evidence, however, that the deprivations they have experienced have inflicted demonstrable *psychological damage* on them. Nor have they directed the Court to medical or penological authorities holding that, as a general proposition, such deprivations are calculated to induce mental deterioration or imbalance. Indeed, it is

doubtful that such a consensus of medical and penological opinion could be marshalled.[37] On the other side of the balance, the Court must recognize that the substantial loss of privileges imposed on the plaintiffs is part of a necessary system of rewards and punishments, designed to promote conformity to prison regulations not only by the plaintiffs but by the remaining members of the prison population. It must also acknowledge that any such system, to be effective in a community where substantial restrictions on freedom are the norm, must have a sanction of some severity for serious breaches of that community's law.

These observations lead to two others relevant to disposition of the cruel and unusual punishment issues. As previously noted, the deprivations which the plaintiffs have experienced must be evaluated in the context of their duration and of the cause for their imposition.

■ The plaintiffs were compelled to remain in solitary confinement from May 7 to July 9, 1973. Although they still remain in solitary, their confinement there has been voluntary since July 9th and I conclude, accordingly, that two months is the legally relevant period for Eighth Amendment purposes. While the loss of companionship, exercise and intellectual stimulation for two months is undeniably a severe punishment, the duration of these deprivations was short when compared to those situations which have heretofore been held to shock the conscience of our contemporary society. Other courts have upheld comparable restrictions which lasted for periods in excess of a year.[38]

Finally, neither the harshness nor the duration of plaintiffs' punishment was disproportionate to their offense. The plaintiffs were placed in solitary confinement not for an innocuous violation of

---

36. Compare Jackson v. Bishop, 404 F.2d 571 (8th Cir. 1971).

37. The lack of consensus among psychiatrists and penologists on these issues has been judicially noted. Sostre v. McGinnis, *supra*, 442 F.2d at 193, n. 24.

38. *E. g.*, Knuckles v. Prasse, *supra* (400 day solitary confinement) ; Sostre v. McGinnis, *supra* (indefinite solitary confinement).

prison rules but for allegedly committing an offense as serious as any known to the prison environment. Whether the plaintiffs are guilty of assaulting Lt. Pope is, of course, a determination properly left to the Delaware criminal courts. It is not pre-judging that issue, however, to credit Superintendent Anderson with the good faith belief that the plaintiffs were the probable perpetrators of that assault and that the security and discipline of the prison required their confinement.[39] Accordingly, the Court cannot say that the plaintiffs' punishment was disproportionate to their offense or that it was unwarranted by a legitimate institutional objective.

After evaluating the physical and psychological hardship it has caused, its duration and the penal objectives which motivated it, I conclude that the form of solitary confinement experienced by these plaintiffs did not constitute cruel and unusual punishment.

## IV. ACCESS TO READING MATERIALS IN SOLITARY CONFINEMENT

Finally, the plaintiffs assert that their right to free expression under the First Amendment has been abridged by the prison's refusal to grant them access to books, magazines and periodicals in solitary confinement.

 It is clear that the First Amendment protects the right to receive ideas no less than it protects the right to disseminate them. Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); Stanley v. Georgia, 394 U.S. 557, 564, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969). Thus, the

plaintiffs stand on sound footing when they invoke the First Amendment in their role as potential recipients of expression of their own choosing.

 It is equally clear that incarceration does not strip one of his First Amendment rights, and that the guarantees of that constitutional provision are applicable to states under the Fourteenth Amendment. Cruz v. Beto, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); Long v. Parker, 390 F.2d 816 (3rd Cir. 1968). However, application of the First Amendment right to access to ideas in the context of solitary confinement is a task which apparently has not heretofore been undertaken by a federal court.[40] In approaching this virgin territory, I think it important to note at the outset what is not involved in this case. This is not a case of prison censorship of particular ideas. The rule which precludes inmates from receiving books, magazines and newspapers while they are in solitary confinement does not have the effect of permanently foreclosing exposure to any source of expression. While inmates in isolation cannot read the material they might otherwise read, they may absorb that same material upon their release from solitary. The question, therefore, is whether, and the extent to which, prison officials may delay access to written expression in the course of creating the isolation effect of solitary confinement. The problem for resolution is, accordingly, different in my judgment from that presented in those prison censorship cases which hold that prison officials cannot deprive an inmate of access to certain types of reading materials absent a showing that the exposure of the inmate

39. Whether the plaintiffs' confinement was accompanied by the procedures mandated by due process is a distinct issue. While some courts have held that solitary confinement imposed without due process is per se cruel and unusual punishment, see, e. g., Landman v. Royster, supra, the better approach in this Court's judgment is to analyze the Eighth Amendment and Fourteenth Amendment questions independently. Thus, for Eighth Amendment purposes, the proper inquiry is

whether Superintendent Anderson was motivated to place the plaintiffs in solitary confinement by a "legitimate penal objective," not whether he observed the requisite procedural safeguards.

40. In Sostre v. McGinnis, the plaintiff inmates complained of severely restricted access to reading materials. The court considered the matter in the context of the Eighth Amendment, however, and not the First.

to that material would create "a clear and present danger of a breach of prison security or discipline or some other substantial interference with the orderly functioning of the institution."[41]

Nor is this a case where regulations imposed by prison authorities restricting the access of a First Amendment right "fall more harshly on . . . [one group] than another."[42] The restriction here attacked is a condition of solitary confinement to which all inmates are subject if they violate certain pre-established rules.

The more appropriate line of authority would seem to be the numerous cases which teach that the exercise of First Amendment rights in an institution are subject to control by non-discriminatory rules relating to time, place and manner when those rules are reasonable in light of the character and purpose of the institution.[43]

Professor Wright has articulated the governing rule in the campus context:

Expression must be wholly free. Neither the state in general, nor the state university in particular, is free to prohibit any kind of expression because it does not like what is being said. Reasonable and non-discriminatory regulations of time, place, and

41. Long v. Parker, 390 F.2d 816, 822 (3rd Cir. 1968); Note, State Prison Censorship Procedures, 47 N.Y.U. 985 (1972). In O'Malley v. Brierley, 477 F.2d 785 (3rd Cir. 1973), the Third Circuit articulation of this test appears to have been changed to "clear and *probable* danger" from such exposure. The court takes judicial notice of the fact that some of the periodicals to which these plaintiffs subscribe have no tendency to incite violence and do not otherwise present a "clear and present" or a "clear and probable" danger of this kind. There was no evidence with respect to the character of the remainder of the material to which plaintiffs seek access.

42. Long v. Parker, *supra* 390 F.2d at 820. See Knuckles v. Prasse, 302 F.Supp. 1036, 1059 (E.D.Pa.1969) affd. 435 F.2d 1255 (3rd Cir. 1971) (Generally applicable regulations on correspondence tested by a different standard than regulations burdening adherence of one religious faith more than others).

43. Wilson v. Prasse, 463 F.2d 109 (3rd Cir. 1972) (test for rules regulating prison worship service held to be reasonableness of the rule); Sharp v. Sigler, 408 F.2d 966, 971 (8th Cir. 1969) (Blackmun, J.) (in reviewing prison regulation of the right to free exercise of religion, "the standard is one of reasonableness."); Sword v. Fox, 446 F.2d 1091 (4th Cir. 1971) (sustaining regulations on place of college campus expression under the test of whether they were reasonable in light of the "special characteristics of the school environment"); Powe v. Miles, 407 F.2d 73 (2nd Cir. 1968) (regulation of timing of campus demonstrations sustained as reasonable); Jones v. Board of Regents, 436 F.2d 618, 620 (9th Cir. 1970) (recognizing that a university may constitutionally impose "reasonable rules regulating time, place and manner of the exercise of First Amendment rights"). See also United States v. Aarons, 310 F.2d 341 (2nd Cir. 1962); Wolin v. Port of New York Authority, 392 F.2d 83, 94 (2nd Cir. 1968); Wright, The Constitution On Campus, 22 Van.L.Rev. 1027 (1969). The reasonableness test of which these authorities speak differ from that referred to in O'Malley v. Brierley, 477 F.2d 785 (3rd Cir. 1973) where the court passed upon prison action having the effect of foreclosing all contact between the plaintiff inmates and their priests. The court there placed upon the prison officials the burden of proving that their action constituted the least possible restriction on the plaintiff's constitutional rights consistent with the maintenance of prison discipline. Because *O'Malley* involved preclusion from a source of expression and not a regulation of time, place or manner, this test is inapposite here. I also consider it an impractical one in a context like the present one. While the alternatives available to prison officials when responding to serious breaches of prison rules by inmates already subject to maximum security conditions are very limited and while this Court is unable to think of a less restrictive effective alternative than isolation, one could always maintain that a modified isolation with some limited access to reading material or to visitors, etc. would have sufficient deterrent and rehabilitative effect, and the contrary would be difficult, if not impossible, to prove. Where sanctions for serious breaches of prison rules are involved, the problems of accurately measuring such effects are sufficiently difficult and the consequences of a misjudgment sufficiently grave, that judicial review by other than a reasonableness standard would not, in my judgment, be practical.

manner are the only restrictions that can be put on expression.

\* \* \* \* \* \*

. . . The nature of the university, and the pattern of its normal activities, dictate the kinds of regulations of time, place, and manner that are reasonable, but the First Amendment is no bar to reasonable regulations of that kind.[44]

Application of this rule, operating as it does in the sensitive area of First Amendment rights, must be carefully circumscribed in accordance with its supporting rationale. The theory is that non-discriminatory regulations of time, place and manner are permissible if, but only if, they are reasonably designed to serve an important state interest and do not significantly infringe upon the values determined by the First Amendment to be pre-eminent.

■ I conclude that the non-discriminatory rule challenged here serves an important state interest and that the delay of access to reading materials it occasions involves no significant compromise of First Amendment values.[45]

■ A state has a compelling interest in maintaining order and discipline in its penal institutions. Because of the nature of those institutions, the task is a difficult one. A system of rules and effective sanctions for their breach is essential to the safety of both the inmates and staff, as well as to the institution's rehabilitative efforts. In almost all of the nation's institutions the sanction of last resort for serious breaches of prison order is solitary confinement.[46] The essence of this sanction is enforced isolation; its effectiveness depends on the deprivation of contact with the world beyond the cell.[47] This Court, accordingly, cannot say that the challenged regulation is not reasonably designed to serve an important state interest.

Nor does it appear to this Court that the rule in question imposes any significant burden on the First Amendment rights of inmates. As previously noted, it does not cut them off from any source of expression. Its effect is ordinarily to delay access for no more than fifteen days. In this case the delay was more extended but still limited to approximately two months. While a longer deprivation would present a more difficult question, I conclude that the appli-

---

44. Wright, The Constitution On The Campus, 22 Van.L.Rev. 1027, 1039, 1042 (1969). The Supreme Court's recent opinion in Papish v. University of Missouri Curators, 410 U.S. 667, 670, 93 S.Ct. 1197, 1199, 35 L.Ed.2d 618 (1973) reflects the same principles:

. . . There is language in the opinions below which suggests that the University's action here could be viewed as an exercise of its legitimate authority to enforce reasonable regulations as to the time, place, and manner of speech and its dissemination. While we have repeatedly approved such regulatory authority, e. g., Healy v. James, 408 U.S. [169], at 192–193, [92 S.Ct. 2338, 33 L.Ed.2d 266] the facts set forth in the opinions below show clearly that petitioner was dismissed because of the disapproved *content* of the newspaper rather than the time, place, or manner of its distribution.

45. Professor Emerson's oft cited analysis of these values has been summarized as follows:

. . . First (and, in the prison context, most important), freedom of expression stimulates self-realization and development of character. Second, freedom of expression is invaluable in attaining the truth. Third, freedom of expression allows all members of society to participate in the democratic decision-making process through open debate. Fourth, freedom of expression aids the achievement of the compromises necessary for the operation of a viable democracy. Note, Prison Censorship, 47 N.Y.U.L.Rev. 985, 998 n. 63 (1972).

46. Sostre v. McGinnis, 442 F.2d 178, 192 (2nd Cir. 1971).

47. There are, of course, degrees of isolation and some deterrent effect could undoubtedly be obtained by isolation from face-to-face contact with others alone. It is nonetheless true that the deterrent value of isolation is appreciably augmented by the absence of reading materials.

cation of the non-discriminatory rule of delayed access in this case did not violate the plaintiffs' right to receive expression of their own choosing.

## V. RELIEF

This Court holds that plaintiffs were held in solitary confinement for approximately two months in violation of their right to due process of law and that for a similar period they were unlawfully deprived of their right of fair access to available legal research materials. The question of appropriate relief remains.

Plaintiffs request that a mandatory injunction be issued compelling defendants to return them to B block and afford them all the privileges that they enjoyed prior to May 7, 1973. Further, plaintiffs request wide injunctive relief prohibiting defendants from assigning any prisoner to solitary confinement "without prior notice and an opportunity to be heard in accordance with duly established written prison regulations."

These applications for injunctive relief will be denied. As the Court has already indicated, the testimony at trial established that plaintiffs are currently free to transfer to B block; since I have held that they have no constitutional right to return to their *prior* conditions of confinement on B block, this aspect of the equitable relief plaintiffs seek is inappropriate. United States ex rel. Tyrrell v. Speaker, 471 F.2d 1197 (3rd Cir. 1973).

Nor do I think it appropriate on this record to enjoin the defendants from future assignments of plaintiffs to solitary confinement without following the procedure set forth in the Correctional Center Rules. First, it has not been determined that all of the procedures prescribed by these rules are constitutionally required, and, absent such a determination, their enforcement is not properly a task for this Court. More importantly,

while I have found a violation of plaintiffs' constitutional rights to due process of law, nothing in this record suggests a reasonable expectation that a similar violation may reoccur. The existence of the Rules and the unique circumstances of plaintiffs' assignment to isolation, together with the absence of any allegation or proof that defendants have in the past assigned inmates to isolation in violation of constitutionally protected rights, are entirely consistent with the conclusion that the plaintiffs' treatment was an isolated exception to normal prison practice. The record, accordingly, does not present a court of equity with a sufficient predicate for an injunction in the form requested. At the same time, I believe plaintiffs (other than plaintiff Dickerson) are entitled to injunctive relief against any future adverse consequences of their confinement in the isolation section from May 16 to July 9, 1973. I will confer with counsel on an appropriate form of order and hear additional testimony if necessary.[48]

The current limitation on access to available legal research materials in solitary confinement presents a significantly different situation. The offending restrictions were imposed pursuant to a prison rule that remains applicable to all inmates found to have violated certain regulations. Plaintiffs remain subject to this rule. The record indicates, that, absent judicial intervention, this unconstitutional regulation may well be applied in the future. Injunctive relief is, accordingly, appropriate with respect to that regulation.

The Order effectuating this opinion will enjoin the defendants from applying the current limitation on access to law books to these plaintiffs. Defendants may, of course, thereafter request this Court to modify the injunction if, in their view, changing prison circumstances make it appropriate to do so.

---

48. The current record does not reveal, for example, what if any "good time" has been lost as a result of this confinement.

Plaintiffs further claim a right to money damages both to compensate them for the loss of their constitutionally protected rights and, appropriately they assert, to punish the wrongdoers.

There is no evidence in the record that defendants Martin, Redman, Redden or Edwards, the only members of the correctional staff of the prison named as defendants, have had any role in the formulation of the policy that restricts plaintiffs' access to available legal research materials; nor is there any evidence that these defendants played any role in the determination not to accord plaintiffs procedural fairness after they were assigned to isolation. In the absence of such evidence, plaintiffs have failed to prove that these defendants are legally responsible for the violation the Court has found. For this reason, judgment will be entered in favor of these defendants.[49]

Although an agent of the state, the remaining defendant, Superintendent Anderson, is not clothed with the same immunity as the state itself. Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). While the record does not indicate that Anderson is responsible for the original formulation of the regulations governing plaintiffs' present confinement, the fair inference is that he was authorized during the relevant period to dictate the conditions of plaintiff's confinement. Moreover, it was his decision which denied to plaintiffs the opportunity to be heard that, constitutionally, was due them. His actions, however, do not provide a legally sufficient basis for an award of money damages in this case.

While not sharing in the absolute immunity of the state, a state officer does enjoy a substantial immunity from liability based upon his official acts. As recently noted by the Third Circuit in Johnson v. Alldredge, 488 F.2d 820 (3rd Cir., 1973), this immunity arises when two elements are satisfied. When action of an executive officer has a substantial policy-making or judgmental aspect and when that action is " 'within the outer perimeter' of the defendant-official's duties", the officer is immune from liability for injuries that might follow as a consequence. See Barr v. Matteo, 360 U.S. 564, 571, 79 S.Ct. 1335, 1339, 3 L.Ed.2d 1434 (1959); 3 Davis, Administrative Law Treatise § 26.06 (1970 Supp.). With respect to the second element, the Court in the *Johnson* case noted that "the immunity of an officer from damage liability is dependent not upon the legality [i. e., constitutionality] of his action, but upon its having sufficient connection with his duties that the officer could reasonably believe his action authorized." [50]

Here the dual analysis mandated by *Barr* must be undertaken in the context of two constitutional deprivations. It is plain that the rule regulating access to law books had the "qualities of permanence and breadth characterizing policy judgment," Johnson v. Alldredge, *supra* 488 F.2d at 825, and that its application to plaintiffs was clearly within Anderson's scope of authority. Liability for damages, therefore, will not lie against him for any injury resulting therefrom.

Superintendent Anderson's failure to accord plaintiffs a hearing fol-

---

49. Defendant Delaware Correctional Center is an agency of the state and is immune from suit in this Court. U.S.Const. Amend. XI. *Cf.* City of Kenosha v. Bruno, 412 U.S. 507, 93 S.Ct. 2222, 38 L.Ed.2d 109 (1973). Plaintiffs' claim against the Delaware Correctional Center will be dismissed for want of jurisdiction.

50. In the *Johnson* case, the challenged prison regulation sanctioned the seizure of legal materials from a prisoner placed in disciplinary segregation. The court found that the warden was "authorized to regulate the security and discipline of prisoners," that the regulation "embodied a decision of policy," and that he was, accordingly, entitled to immunity.

lowing their commitment, under emergency conditions, to the isolation section presents a somewhat different question. The conclusion under the particular facts of this case must be the same, however. Superintendent Anderson had the responsibility of conducting the affairs of the institution. The prison rules on their face required an Adjustment Board hearing at some time in connection with each commitment to solitary. In this instance, however, Superintendent Anderson was confronted with a situation which he believed in good faith might have ramifications beyond the prison walls. In a very real sense, he was placed in the position of having to reconcile the apparently conflicting demands of two applicable sets of legal rules. He thought it better to deviate from the prison rules rather than to run the risk of jeopardizing the processes of the criminal law. The circumstances called for an exercise of judgment in an area in which he could reasonably have believed he was authorized to act. Accordingly, Superintendent Anderson is immune from damage liability with respect to plaintiffs' due process claims.

Submit order.

## APPENDIX A

Footnote from page 4:

Articles 24, 25 and 26 of the "Rules for the Treatment of Inmates in Delaware Correctional Institutions" provide as follows:

24. The following shall be determined in accordance with the written regulations of the administrative authority;

(1) conduct constituting a disciplinary offense;

(2) the types and duration of punishment which may be inflicted;

(3) the authority competent to impose such punishment.

25. No inmate shall be punished except in accordance with the terms of such written law or regulation, and never twice for the same offense.

26. *Conducting Hearings*

(1) Whenever punishment (including, but not limited to, loss of good time, restriction of privileges or deprivation of rights) is to be imposed upon an inmate for violating a rule, or whenever an inmate's status is to be adversely affected by a transfer to another institution, or classification within that institution, that inmate shall have a right to a hearing before the Adjustment Board.

(2) An inmate shall have the following rights before punishment is to be imposed or status affected:

(a) The circumstances of the charge will be read and fully explained by the Chairman of the Committee at which time a copy will be given to the inmate;

(b) The inmate shall be advised that, in cases where a violation of the Delaware law is alleged to have occurred for which additional imprisonment may be imposed, the inmate has the right to the assistance of counsel and that in all other cases he may be represented by his counsel, a social worker, or another responsible staff member or inmate as the Board shall permit;

(c) The inmate shall be permitted to admit or deny the charges and if he shall refuse to plead, a denial shall be entered;

(d) The Adjustment Board members shall question the inmate and others as necessary;

(e) The inmate may present competent evidence for the consideration of the Board;

(f) In the case of a denial by the inmate of a charge of a major violation, the inmate at his hearing shall be confronted by his accusors and may cross-examine his accusors and other witnesses and shall be able

to compel the attendance of not more than five (5) witnesses on his behalf if they are within the jurisdiction of the institution; provided, however, that the Adjustment Board may permit as many additional witnesses for either side as it deems necessary.

(g) After decision is reached by the Adjustment Board, the inmate shall be called before the Adjustment Board to hear the decision and to be advised of its rationale and consequences.

(h) An Adjustment Board decision must be based upon substantial and competent evidence.

(i) The inmate will be informed that the Adjustment Board decision will be formally reviewed by the Superintendent and that a further appeal lies to the Division of Corrections.

(j) The inmate shall be informed that he may request assistance from his counsel if any, in framing exceptions to the decision which shall be incorporated in the record on review.

Subsection 4 of Article 29 of these Rules provides as follows:

(4) Punishment for major violations shall be any one or more of the following:

(a) Those penalties designated for minor violations;

(b) Loss of good time not to exceed thirty days; provided, however, that such good time may be restored at any time by the Administration in accordance with the laws of Delaware;

(c) Administrative isolation not to exceed fifteen days which may, at the Board's discretion, be served in shorter periods;

(d) Loss of visiting privileges not to exceed thirty days.