Lester M. JOHNSON et al., Plaintiffs,

v.

Raymond W. ANDERSON et al., Defendants.

Civ. A. No. 4534.

United States District Court, Delaware.

Sept. 30, 1976.

Paul P. Welsh, of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for plaintiffs.

Francis A. Reardon, Deputy Atty. Gen., Wilmington, Del., for defendants.

## OPINION

STAPLETON, District Judge.

This is an action brought under the Civil Rights Act[1] by a number of inmates of the Delaware Correctional Center at Smyrna, Delaware. Plaintiffs complained of having been transferred from within the maximum security wing of the prison to the "isolation section" (solitary confinement) without a hearing and, *inter alia*, about the restrictions placed on their access to legal materials while confined in that section. Counsel was appointed to represent the plaintiffs, and after trial of the issues, the Court rendered an opinion holding plaintiffs had in fact been denied rights of procedural due process,[2] and, additionally, had been de-

---

1. 42 U.S.C. § 1983.

2. This ruling applied to only five of the plaintiffs, there being insufficient evidence of the circumstances surrounding the sixth's confinement in the isolation section. 370 F.Supp. at 1380 n. 8.

prived of rights of due process respecting the availability of legal materials. *Johnson v. Anderson*, 370 F.Supp. 1373, 1379–82, 1383–85 (D.Del.1974).

The sole defendant found accountable for these violations was the superintendent of the correctional facility, Superintendent Anderson.[3] No damages were assessed against him, however, because of this Court's ruling that, under the then prevailing case law of this Circuit,[4] the Superintendent was entitled to the protection of the official immunity doctrine. On appeal, the Third Circuit initially affirmed in toto,[5] but later modified its judgment order to provide that the case would be remanded for reconsideration of the official immunity issue in light of *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) and *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (Feb. 25, 1975) which had been decided by the Supreme Court of the United States after the entry of judgment in this case. The immunity issue has now been rebriefed and reargued to the Court.

## I. The Applicable Law.

Under the doctrine of official immunity, as interpreted by the Third Circuit in *Johnson v. Alldredge*, 488 F.2d 820 (3rd Cir. 1973), and *Fidtler v. Rundle*, 497 F.2d 794 (3rd Cir. 1974), the focus was on the character and scope of the official's responsibility. As the Third Circuit has since explained its view at the time of the original decision in this case, "It was our view that if the governmental officials performing discretionary governmental duties acted within the scope of their official responsibilities, they were immune from damage actions although they were charged with having acted mistakenly or even maliciously." *Skehan v. Board of Trustees*, 538 F.2d 53, 59 (3rd Cir. 1976) (en banc). In this case, the court determined that "the circumstanc-

es called for an exercise of judgment in an area in which [Superintendent Anderson] . . . could reasonably have believed he was authorized to act" and, accordingly, held him to be immune from damage liability. 370 F.Supp. at 1396.

As the Third Circuit explained in the *Skehan* case, however, *Wood v. Strickland* indicates that the earlier view of our circuit was in error. In order to avail himself of official immunity, an official of the executive branch of government, even though charged with a constitutional violation arising from the exercise of a discretionary function, must establish:

1. that he acted without malice and without actually realizing that his conduct would violate the plaintiff's rights; and

2. that if he did not subjectively know that he was violating plaintiff's rights, his failure to know about those rights was not unreasonable under all of the surrounding circumstances.

*Skehan v. Board of Trustees, supra.*

It is true that neither *Wood v. Strickland*, nor *Scheuer v. Rhodes*, which at least with the benefit of hindsight can be seen as foreshadowing the holding in *Wood*, involved a prison official. In *Scheuer*, the defendants against whom damages were sought were the Governor of Ohio and the Adjutant General of its National Guard, both of whom had made decisions in connection with the Kent State tragedy. In *Wood*, the defendants were school board members who had been responsible for a student's disciplinary suspension. While the responsibilities of a superintendent of a state prison differ in many ways from the responsibilities of those defendants, and while this difference may play a significant role in the application of the second prong of the *Wood* test, I see no reason in principle for departing from the *Wood* analysis in this case. I note also that the Third Circuit

---

3. Four members of the correctional staff who also had been sued were found not to have had any policy-making functions respecting, or to have otherwise played any role in, the violations which occurred.

4. *Johnson v. Alldredge*, 488 F.2d 820 (3rd Cir. 1973).

5. Doc. No. 52.

Court of Appeals has applied *Scheuer* in a prison context. See *United States ex rel. Tyrrell v. Speaker*, 535 F.2d 823 (3rd Cir. 1976).

Application of the first prong of the *Wood* standard does not present a novel task. It involves questions of subjective knowledge and intent which are not unlike questions of fact presented in other areas of the law. Application of *Wood's* second prong, however, will require development of a new jurisprudence. The Third Circuit noted this fact in the *Skehan* case and offered the following suggestions to district courts thereafter venturing into these "largely unchartered waters":

> While we can give guidance to the district court as to where various burdens lie on the *Wood v. Strickland* qualifications, we are less confident of our ability to suggest by what criteria the reasonableness of the several defendants' lack of knowledge of due process requirements should be measured. The district court will be required to inquire into the status and responsibility of each individual defendant and to determine whether, for example, a trustee should be held responsible for the same level of knowledge of constitutional rights as a college president or a commissioner of education. The determination may turn on the relative availability to each defendant of counsel, as well as the relative certainty of the legal issue, a criterion to which the *Wood v. Strickland* Court expressly adverted. 420 U.S. at 322, 95 S.Ct. at 1612.

Having reviewed these general principles, I turn to their application in the factual context of this case.

## II. *Superintendent Anderson's Immunity Defense.*

### A. *The Unreasonable Burden On Plaintiffs' Right Of Access To The Courts.*

I first consider the due process violation involving plaintiffs' access to legal materials. The plaintiffs in this case were not denied all access to legal materials and the restrictions which they did experience were a part of a prison policy applicable generally to all prisoners placed in isolation. That policy was a part of an overall system of punishment and reward designed to serve a legitimate state interest—prison discipline. As this Court observed in its earlier opinion, prison officials are entitled to employ such a system to serve this end. They may also place restrictions on access to legal materials so long as the restrictions imposed are reasonable. A determination of reasonableness in each case necessarily turns on a balancing of the conflicting interests of the prisoner and the prison administration.

■ I am satisfied that Superintendent Anderson did not impose or enforce the rules restricting isolation inmates' access to legal materials out of malice or with the realization that those rules were in violation of the federal constitution. Moreover, this case does not seem to the Court to present a situation in which liability should be imposed because of a negligent failure to be aware of the rights in fact violated. As the *Wood* test recognizes, prison administrators are not insurers against all violations of prisoners rights. Nor are they required to seek legal advice about every aspect of prison life. What is required is that they go about their duties with the same care that a reasonable person having the same responsibilities and resources would exercise in the same circumstances. As previously noted, the offending rules did not block all access to legal materials, and were intended to serve a legitimate state interest. While this Court held, after an analysis of the competing interests, that these rules were not reasonable, the previously decided case law was not such as to give clear notice of the invalidity of the rules. Under these circumstances, I conclude that a reasonable person in Superintendent Anderson's position might well have been ignorant of the applicable law and might well have failed to seek the advice of counsel with regard to this particular aspect of the prison rules. Accordingly, he is immune from liability for this constitutional infringement.

*B. The Failure To Accord Plaintiffs A Hearing After The Emergency Situation Had Passed.*

On May 7, 1973, all of the plaintiffs were housed in B block of the maximum security building at the Correctional Center.[6] On that evening, Lt. Pope was assaulted in or near B block and stabbed numerous times about the chest, back and head. When Superintendent Anderson arrived at the scene of the attack, he was informed by Captain Williams that Lt. Pope had implicated five of the six plaintiffs in the assault and that Captain Williams had placed these five inmates in solitary confinement.

Superintendent Anderson initiated an investigation of the Pope incident. This investigation included an interview with Lt. Pope and the taking, after some unspecified delay owing to his condition, of a statement from him. In the course of the investigation, the matter was referred to the Attorney General's Office for possible criminal prosecution.

On May 16, 1973, Superintendent Anderson sent a written memorandum to the five plaintiffs in solitary entitled "Explanation of Transfer to Isolation Section". The memorandum read as follows:

> You were placed in the Isolation Section of the Maximum Security Building on Monday, May 7, 1973 at approximately 11:00 P.M., at which time you were informed and read, by Capt. James A. Williams in the presence of other Correctional Officers, your Constitutional Rights and the reason for your transfer to the Isolation Section. This is in accordance with the Rules for the Treatment of Inmates, Pages A–10 and A–11, Article # 31.[7]

> The reason for your transfer to the Isolation Section of the Maximum Security Building is the alleged assault on Lt. Earl Pope and Correctional Officers Michael McCarty and Ralph Thompson. This is not a punishment measure on the part of the Center. Your case has been referred to the Attorney General's Office for further action.

In its earlier opinion, this Court held that an emergency situation existed prior to May 16th and that neither the prison rules nor the due process clause required that plaintiffs be afforded a hearing before that date. Plaintiffs were required to remain in isolation, however, until July 9th and none of the plaintiffs was ever afforded the opportunity to tell his side of the story to a correctional official or board. As the Court indicated in its prior opinion, the rules of the prison contemplated that, under these circumstances, a hearing would be held before the Adjustment Board as soon as the emergency conditions terminated. As this Court there held, the due process clause also mandated some opportunity for each plaintiff to be heard:

> In striking this constitutional balance here, we are aided by several established propositions.

> First, absent an unusual circumstance, the Due Process Clause required that, prior to the imposition of solitary confinement, an inmate must at least be given notice of the charge against him and an opportunity to tell his side of the story. *Gray v. Creamer,* 465 F.2d 179 (3rd Cir. 1972); *United States ex rel. Tyrrell v. Speaker,* 471 F.2d 1197 (3rd Cir. 1973); *Biagiarelli v. Sielaff,* 483 F.2d 508 (3rd Cir. 1973); *Braxton v. Carlson,* 483 F.2d

---

**6.** The maximum security building is divided into three parts: general population, B block, and the "isolation punishment section". Inmate Reference Manual pp. 10–11. B block "is used to house special behavioral problems and those who cannot function in the general population."

**7.** Article 31 provides:
*Emergency Provisions*
   (1) When faced with an immediate threat to the security of safety of the institution or any

of its employees or inmates, officials of the institution may temporarily reassign, segregate or sequester inmates;
   (2) As soon as security permits, the inmates shall be informed in writing of the nature of the charges or reason for their assignment, segregation or sequestration and afforded their rights under these regulations; and
   (3) Emergency measures shall be reported to the superintendent and the Office of the Director of the Division of Corrections.

933 (3rd Cir. 1973); *Sostre v. McGinnis,* 442 F.2d 178 (2nd Cir. 1971); *Adams v. Pate,* 445 F.2d 105 (7th Cir. 1971).

Second, the cases are unanimous in holding that the state's legitimate interest in the security of its penal institutions is sufficiently compelling that an inmate may, consistent with due process of law, be transferred to solitary confinement summarily whenever the security of the institution so requires. See e. g., *Gray v. Creamer,* supra at n. 6; United States ex rel. *Arzonica v. Scheipe,* 474 F.2d 720 (3rd Cir. 1973); *Biagiarelli v. Sielaff,* supra; *Braxton v. Carlson,* supra.

Third, the existence of exigent circumstances which permit the state to summarily subject an inmate to the added privations of solitary confinement does not relieve the state of the responsibility of providing at a later time the procedures that the Constitution would otherwise require prior to the imposition of the new status. Said more simply, when the reason for the emergency exception to the hearing requirement is no longer apposite, the exception is no longer apposite. If, after the emergency which gave rise to the inmate's reassignment passes, the inmate is to be kept in his new status notice of charges and an opportunity to respond are required. *Urbano v. McCorkle,* 334 F.Supp. 161 (D.N.J.1971). The test of when this right arises is one of reasonableness under all the circumstances of the case. *Braxton v. Carlson,* 483 F.2d 933 (3rd Cir. 1973).

370 F.Supp. at 1379–80.

Superintendent Anderson decided not to hold a hearing as required by the prison rules because of the erroneous view that a prison proceeding would create "double jeopardy problems" and jeopardize the contemplated criminal proceedings in a court of law.

I need not determine whether Superintendent Anderson could be said in this context to have realized that he was violating plaintiffs' rights. This is so because he has not satisfied the second prong of the *Wood* test.

■ At the time in question, Superintendent Anderson was responsible for the supervision of all aspects of Delaware's largest correctional institution. His position was a full time and compensated one. By virtue of his position, he had access to legal advice from the Attorney General's office and, indeed, conferred with that office during the course of his investigation. His interview with the press on May 8th,[8] his written memorandum of May 16, and his trial testimony all demonstrate that he focused upon the question of the possible procedural rights of plaintiffs and had the opportunity, at least by May 16th, to give this matter mature reflection. Moreover, his reason for not following the clear mandate of the prison's own rules was based upon his personal layman's view of the effect of the double jeopardy clause of the Constitution.

Under these circumstances, I conclude that a reasonable man in Superintendent Anderson's position would have sought legal counsel from the Attorney General's office concerning plaintiffs' procedural rights. If he had sought such advice, he clearly would not have followed the course which he chose. At least by August 14, 1972, when *Gray v. Creamer,* 465 F.2d 179 (3rd Cir. 1972) was decided, the Third Circuit Court of Appeals had clearly established the rule for this Circuit that inmates in plaintiffs' position must be afforded the opportunity to tell their side of the story. It is unfortunate if Superintendent Anderson, nine months later, was still in a position to have to inquire about the clearly established requirements of due process in these circumstances. It would obviously be desirable for him to be advised regularly by counsel on the development in prison law. The record in this case does not reveal whether he had the benefit of briefings of this kind. It does, however, reveal circumstances which would cause a prudent man in Superintendent Anderson's position to seek counsel about plaintiffs' right and to

---

8. See 370 F.Supp. at 1378.

execute his responsibilities in a manner consistent with the advice he surely would have received. Accordingly, I hold that he has failed to establish an official immunity defense with respect to this portion of plaintiffs' due process claim.

### III. *Damages.*

There remains the task of ascertaining the damages proximately resulting from the failure to afford plaintiffs a hearing and of placing a monetary value on those damages. With respect to the first task, the restrictions on plaintiffs' freedom while they were held in the solitary confinement section from May 16th to July 9th, are made clear in the record and are described in the Court's earlier opinion. The question to be resolved relates to the standard with which these conditions should be compared in assessing damages.

The Third Circuit made it clear in *Skehan* that this Court is not free to independently assess the evidence which would have been considered as the result of a hearing and to conclude that, since the hearing would have been to no avail to plaintiffs, no damage resulted from the breach of their procedural due process rights. As the Court there observed, such an approach would not only occasion an unwarranted intrusion by the Court into an area reserved for administrative discretion, but would also remove "a substantial incentive toward[s] affording procedural due process." 501 F.2d 31 at 40.

■ The proper approach would appear to be to compare the conditions of confinement which plaintiffs would have experienced if they had remained on B block (or had been transferred back to that block on May 16th) with those which they in fact experienced in the isolation section. *Cf., United States ex rel. Tyrrell v. Speaker,* 535 F.2d 823 (3rd Cir. 1976). This does not mean, however, that the appropriate comparison is between the conditions on B block prior to May 7th, and those in the isolation section. While, under the *Skehan* rationale, this Court is not free to base any assess-ment of damages upon an assumption concerning the identity of Lt. Pope's assailants, it is not required to ignore the undisputed fact of his assault in assessing the conditions which plaintiffs would have experienced absent a transfer to the isolation section or following a retransfer to B block on May 16, 1973.

The record in this case established that on May 7th, B block was used to house "special behavioral problems and those who . . [could] not function in the general population" of maximum security. Each of these five plaintiffs, for example, had been assigned to that block because the administration had concluded that each had previously committed an assault on a guard or other inmates.[9] As a result of the Pope incident, the administration concluded that the pre-May 7th mode of operation on B block was not safe. Thus, I found the following facts in my original opinion after trial:

"I accept Superintendent Anderson's testimony that the Pope incident convinced him that more stringent security measures had to be taken on B block. That decision was based on the known fact of the assault; identity of the assailants was irrelevant. He directed physical changes which are now largely completed. He also amended the rules applicable to B block to minimize the exposure of guards to inmates outside of their cells. This Court finds no fault with the Superintendent's actions. All inmates presently on B block are subject to a more rigorous confinement than prevailed prior to May 7, 1973. The evidence clearly establishes that these changes were not directed specifically at these plaintiffs. . . ."

370 F.Supp. at 1383.

While the new rules regarding B block were not in fact instituted until July 9th, after the physical changes were completed, one can predict with confidence that, if there had been no transfer of these inmates to isolation, or if they had been transferred back on May 16th, similarly restrictive rules would have been promulgated immediately

9.   T. 44.

for B block.[10] And, as I have previously suggested, the imposition of such restrictions would have been based on an assessment of the hazards in B block rather than an assessment of the guilt of these individuals. The July 9th rule revisions, for example, were applied generally after that date to inmates on B block despite the fact that these plaintiffs refused to return there from the isolation section.

Accordingly, I conclude that damages are properly assessed by comparing the conditions on B block after the July 9th rules revision with those that prevailed in the isolation section from May 16th to July 9th. This does not mean that plaintiffs suffered no damage; it does, however, alter the damage equation.

■ The previous opinion of this Court discusses in detail the conditions in solitary and the conditions in B block after July 9th. Those details need not be repeated here. With respect to solitary, I found, in summary, that the inmates were provided with the basic essentials for the maintenance of health, but that the perpetual confinement to one's cell, the denial of access to a radio and all reading materials (other than very limited access to legal reference books), and the denial of visitation, caused inmates to live "a monotonous and bleak existence". Life in B block undoubtedly could be described with similar adjectives. Inmates were confined to their cells 23 hours a day, were never permitted beyond the tier in front of their cells, and had extremely limited contact with other people. As in solitary confinement, there was no access to educational, vocational or work programs. There was, however, some relief from the monotony for B block inmates. They were allowed out of their cells each day, in the company of one or two other inmates, for an hour of exercise on their tier. They were also permitted access to a radio, to reading materials and to visitation. This access was substantially restricted to be sure, but it did offer a significant opportunity for escape from the kind of boredom necessarily associated with solitary confinement.

It is, accordingly, not difficult to conclude that the plaintiffs have suffered damage. It is a far more difficult task to place a monetary value upon that damage. The law prescribes no formula for calculating an appropriate award with precision. As in other areas of the law, the trier of fact can only be guided by conscience, a sense of fairness, and the well established rule that the difficulties inherent in translating human experience into economic worth must not preclude compensation for a demonstrated loss.

After considering all of the circumstances surrounding plaintiffs' confinement in solitary from May 16th to July 9th in violation of their rights to fundamental procedural fairness, I conclude that an award in favor of each of the five plaintiffs in the amount of $300.00 will do justice to the parties.

■ The assessment of damages against a public official has been a rare occurrence in this Court.[11] The law recognizes that individuals who shoulder the responsibilities of public office must be permitted to pursue those responsibilities without fear of personal liability for the errors of judgment which necessarily attend any human enterprise. As the Supreme Court of the United States indicated in *Wood v. Strickland*, however, public officials must be held accountable for deliberate actions violative of well established constitutional rights of which they are, or clearly should be, aware. The fact that the rights violated are those of citizens who have themselves shown disrespect for the law does not alter this fundamental principle. Though individuals may violate the law, we, as a people, are committed to a government of laws. In-

---

10. While the physical changes could presumably not have been made at an earlier date, these are not relevant to an appraisal of the relative burdens of the two sets of conditions.

11. In the last ten years, there has been only one other case in which an award of this kind was made. *See Davidson v. Dixon*, 386 F.Supp. 482 (D.Del.1974) (monetary judgment recovered for deliberate and brutal beating of the plaintiff-inmate by guards).

mates of our correctional facilities are committed there under our system of law and we must depend largely upon wardens and their agents to ensure a government of laws within the prison walls. Accordingly, there can be "no iron curtain drawn between the Constitution and the prisons of this country." *Wolff v. McDonnell*, 418 U.S. 539, 556, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974). Though a prisoner's "rights may be diminished by the needs and exigencies of the institutional environment . . . [he] is not wholly stripped of [his] constitutional protections when he is imprisoned for crime." *Wolff v. McDonnell, supra*, at 555, 94 S.Ct. at 2974. In particular, each of these five plaintiffs retained the right to have the question of his involvement in the Pope incident determined in a fundamentally fair manner. It was the violation of this well established constitutional right that has resulted in the award of damages provided for herein.

Submit order.