Isiah MACK

v.

Robert L. JOHNSON et al.

Civ. A. No. 74–9.

United States District Court,
E. D. Pennsylvania.

April 21, 1977.

Robert K. Collins, Law Student Intern, Ralph S. Spritzer, Supervising Atty., Indigent Prisoner Litigation Program, Philadelphia, Pa., for plaintiff.

Michael Minkin, Michael von Moschzisker, Deputy Attys. Gen. Eastern Regional Director, Robert P. Kane, Atty. Gen., Philadelphia, Pa., for defendants.

## OPINION AND ORDER

FOGEL, District Judge.

This prisoner's civil rights suit is before us alternatively, on cross-motions for summary judgment pursuant to F.R.Civ.P. 56, or for final judgment as a case stated under F.R.Civ.P. 52(a).[1] Plaintiff, Isiah Mack, contends that his constitutional rights were violated first by his confinement in punitive segregation without an adequate due process hearing, and thereafter by his transfer to another institution in which he was segregated from the general prison population without having been granted a hearing. He seeks, (1) a declaratory judgment which establishes that his rights were violated, (2) damages for the alleged unconstitutional confinement and (3) expungement of all references to the incident and punishment from his prison records.

We have reviewed all of the materials submitted,[2] and based upon that review we conclude that the legal principles which

1. Although counsel for the parties prepared the case for trial, it became clear at the final pretrial conference, that virtually all of the facts had been stipulated, and that very little additional testimony would be needed to round out the record. It was therefore agreed that the parties would file cross-motions for summary judgment, with supporting documents (including plaintiff's deposition, which the parties were directed to take). We issued an order, under date of November 12, 1974, directing the parties, in accordance with this agreement, to submit the case "for decision on affidavits, depositions, and any other materials deemed necessary by counsel" on or before February 1, 1975.

2. The documents, affidavits, and other materials consisted of the following: the deposition of Isiah Mack; a Joint Pre-Trial Order with a stipulation of facts; Answers to Plaintiff's Interrogatories, filed by Walter Smith, Daniel Sims, Harry Godfried, Robert Johnson, Dennis Erhard and Major William Johnson; copies (authenticity was stipulated) of the Misconduct Report, the Punishment Order with reasons, the letter requesting transfer, the Adjustment Report on the initial interview at Huntingdon,

govern in this matter dictate the following result: *First,* entry of summary judgment in favor of defendants Robert L. Johnson, Dennis Erhard and William Johnson, because the facts establish that they neither participated in, nor had any knowledge of any impairment of plaintiff's rights, and *Second* : entry of summary judgment for plaintiff as to defendants Walter Smith, Daniel Sims, Harry Godfried and Richard Parcell because of a clear violation of his civil rights by those defendants. We assess damages against those defendants, jointly and severally, in the amount of $484.50, and against the defendant Harry Godfried, alone, in the additional amount of $280.50. The important legal questions presented by this litigation call for the ensuing explanation of the reasons which have led us to this conclusion.

## I. HISTORY OF THE CASE AND STATEMENT OF THE FACTS

■ Plaintiff was an inmate of the State Correctional Institution at Huntingdon, Pennsylvania (Huntingdon) when this lawsuit was filed. Since commencement of the action, he has been released on parole, and his maximum release date has passed. However, since he is seeking monetary relief, the matter is not moot. *Cf. Preiser v. Newkirk,* 422 U.S. 395, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975).

On August 18, 1973, plaintiff was engaged in an oral altercation with a guard at the State Correctional Institution at Graterford, Pennsylvania (Graterford), as a result of which a misconduct report was submitted to the Behavior Clinic committee at Graterford.[3] A disciplinary hearing was held on August 20, 1973, after which plaintiff was confined to punitive segregation for a period of thirty days. He was present at the hearing, but he claims that he was not given an adequate opportunity to explain his version of the incident to the hearing officers.[4]

Plaintiff sought a review hearing, which was held on August 31, 1973.[5] He alleges that once again he was frustrated in his attempts to explain his story, and he also complains that he was not allowed to call any witnesses to the incident to testify on his behalf. No change in his status was made after this hearing.

On September 19, 1973, the last day of the thirty day segregation period, defendant Robert Johnson, the Superintendent of Graterford, requested that plaintiff be transferred to Huntingdon. This was done immediately. Upon his arrival at Huntingdon, plaintiff was put into segregation. He was interviewed there on September 21, 1973, but, allegedly because his records had not yet arrived from Graterford, he was retained in administrative segregation until

relevant pages of the Cumulative Adjustment Report from Huntingdon, the Clinic Vote Sheet denying Parole, and a letter inquiring about Mr. Mack's furlough status.

3. Plaintiff's version of the incident is that he went onto cell block B to retrieve some books he had loaned to a friend. While waiting for his friend to get his books, Officer Bauk came up and asked him if he knew that he was not supposed to be on that block. The officer also called him "ignorant" several times. The guard told him to leave the block, followed him off, and said at one point: "You know what? You's an ignorant nigger." At that point plaintiff says he responded: "Hold it man. You wouldn't say that if you wasn't a guard." Then he continued off the block, without any further exchange. Deposition at pp. 3–6.

Officer Bauk's version, as presented in the written misconduct report, differs in several particulars. He had seen Mr. Mack moving

onto the block and heading up to the second tier. After several warnings that the plaintiff would have to leave the block, without any response to any of them, Bauk, who felt "as if I was talking to a wall", said, "You know your [sic] pretty ignorant." Plaintiff immediately responded: "What did you call me?" When told again that he had to leave the block, he reportedly added: "If you called me what I think you called me I'll kill you." After a few more words had passed, plaintiff allegedly then said: "Back off before I stick you, if not now later Jack." Mr. Mack then left the block. (Misconduct Report filed on Isiah Mack, attached as Exhibit 1 to Motion of Plaintiff for Summary Judgment).

4. Harry Godfried was the only defendant present at this hearing.

5. Defendants Smith, Parcell and Sims were present at this hearing.

October 5, 1973, when he was released to the general population of the institution.

■ Plaintiff now seeks a judgment declaring that his rights were violated (1) by the failure of the defendants to provide adequate due process guarantees at either of the two Graterford hearings, (2) by his subsequent transfer to Huntingdon without a hearing, or legitimate cause, and (3) by his continued segregation at Huntingdon, again without a hearing or sufficient cause. Plaintiff claims damages in the amount of $1,000.00 for his alleged unconstitutional confinement of forty-six days. He also requests that we order expungement of all references to the incident and ensuing punishment from his prison records, so that they cannot continue to adversely affect his parole and furlough possibilities; this ground is now moot because of his release, and the passage of his maximum release date. *Preiser v. Newkirk, supra.*[6]

## II. THE CONTENTIONS OF THE PARTIES

### A. The Hearings at Graterford

The defendants who were involved, either directly or indirectly (in a supervisory capacity), in the Graterford hearings are Walter Smith, Richard Parcell, Harry Godfried, Daniel Sims and Robert L. Johnson. Their contentions are as follows: *First:* that the hearings held on August 20 and 31, 1973, did not deprive plaintiff of any procedural due process guarantees, and *Second*: that they are immune from suit because they acted within the scope of their discretionary duties and power when they presided over the two hearings. We reject both of these

contentions and therefore grant summary judgment for the plaintiff against the defendants, Walter Smith, Richard Parcell, Harry Godfried and Daniel Sims. Because there is no evidence before us that defendant, Robert Johnson, was actually present at the Graterford hearings, or knew of, or acquiesced in the procedures adopted at those hearings, we will not enter judgment against him on this issue. *Rende v. Rizzo,* 418 F.Supp. 96 (E.D.Pa.1976); *Ammlung v. City of Chester,* 355 F.Supp. 1300 (E.D.Pa. 1973), aff'd, 494 F.2d 811 (3d Cir. 1974). See also, *Fisher v. Volz,* 496 F.2d 333, 349 (3d Cir. 1974).

### 1. The Adequacy of the Hearings

Plaintiff claims that he was denied a constitutionally adequate disciplinary hearing at Graterford on the following grounds: FIRST, he was not permitted to complete his answers to the questions addressed to him at both the August 20, 1973 hearing and the August 31, 1973 hearing; SECOND, he was cut off before he could give his version of events at both hearings; and THIRD, he was not allowed to present witnesses in his behalf at the second hearing.[7] We are not concerned, in this action, with the merits of the charges lodged against plaintiff. Rather, we must determine whether he was afforded a hearing that satisfies the minimum constitutional standards which were required to be met.

The Supreme Court has specifically addressed the question of procedural due process guarantees in the prison discipline context twice within the past three years.[8] In

---

**6.** It is not clear whether plaintiff wishes to press his claim that several items of personal property valued at $50 were lost during his transfer from Graterford to Huntingdon, since this claim is not addressed in any of the briefs. Assuming that the claim is still active, and that mere loss of personal property by prison officials states a constitutional claim, *compare, Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (inadvertent failure to provide adequate medical care to prison inmates not a constitutional violation), we find the claim to be without merit, since there is no evidence in this case that any of the named

defendants had anything to do with the alleged loss.

**7.** Plaintiff was not aware of the possibility of calling witnesses to corroborate his story until he appeared at the first hearing. Plaintiff requested that several witnesses be called at his second hearing, but this request was refused.

**8.** *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), and *Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976). See also, *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), and the companion case of *Mon-*

*Wolff v. McDonnell,* the Court carefully analyzed the countervailing factors requiring consideration in examining prison disciplinary procedures, noting that

> a prisoner is not wholly stripped of constitutional protections when he is imprisoned for crime. There is no iron curtain drawn between the Constitution and the prisons of this country.

*Wolff, supra,* 418 U.S. at 555–56, 94 S.Ct. at 2974. On the other hand,

> the fact that prisoners retain rights under the Due Process Clause in no way implies that these rights are not subject to restrictions imposed by the nature of the regime to which they have been lawfully committed. [citations omitted] Prison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply.

*Id.,* at 556, 94 S.Ct. at 2975.

■ In light of these considerations the Court refused to establish rigid and extensive due process requirements for prison disciplinary hearings, but did establish certain minimal standards. These include (1) written advance notice of the charges; (2) a written statement by the factfinders as to the evidence upon which they relied and the reasons for the disciplinary action, *id.,* at 563, 94 S.Ct. 2963; (3) the right to present documentary evidence and (4) the right to call witnesses as long as their presence would not cause undue hazards to institutional safety or correctional goals. *Id.,* at 566, 94 S.Ct. 2963. The Court specifically refused, however, to give *Wolff* retroactive effect. *Id.,* at 573–74, 94 S.Ct. 2963. Thus the holding in *Wolff* does not govern the litigation before us.[9]

In *Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976) the Supreme Court attempted to clarify its holding in *Wolff.* Specifically, the Court noted that (1) inmates did not have a constitutional right to have counsel, whether privately

retained or publicly appointed, in prison disciplinary proceedings, even when the charges involved criminal conduct; (2) the Fifth Amendment privilege against self incrimination did not forbid drawing adverse inferences from the failure of the inmate to testify at his hearing; and (3) the prison officials need not provide written reasons for denying the privilege of confrontation and cross-examination of adverse witnesses to an inmate.

Ours is a pinpointed inquiry. *What was required of defendants in order to meet the minimal obligatory procedural due process standards in connection with prison discipline matters at the period which is relevant to this litigation?* In *Gray v. Creamer,* 465 F.2d 179 (3d Cir. 1972) the Court held that,

> the transfer of a prisoner from the general prison population to solitary confinement without either notice of the charges or a hearing does not, absent unusual circumstances not evident in the pleadings, meet minimal due process requirements. (footnote omitted)

*Id.,* at 185. Specifically, the Court noted that

> [i]n most cases it would probably be difficult to find an inquiry minimally fair and rational unless the prisoner were confronted with the accusation, informed of the evidence against him, . . . and *afforded a reasonable opportunity to explain his actions.* (citations and footnote omitted, emphasis added)

*Id.,* quoting from *Sostre v. McGinnis,* 442 F.2d 178, 198 (2d Cir. 1971), cert. denied, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972).

This view was reiterated in *United States ex rel. Tyrrell v. Speaker,* 471 F.2d 1197 (3d Cir. 1973), when the Court noted that

> *Gray* requires that Tyrrell's transfer to punitive segregation by the Superintendent of Graterford or a warden of the

---

*tayne v. Haymes,* 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976), on the related problem of due process requirements for inter-prison transfers.

**9.** The hearings in this case were held on August 20 and 31, 1973. *Wolff* was decided on June 26, 1974.

Delaware County Prison be based, after hearing, on "facts rationally determined." *Id.*, at 1203.

### (a) Opportunity to explain his actions

█ Plaintiff does not dispute the fact that he was given written notice, prior to the hearing, of the charges lodged against him, or that the hearings were, in fact, held. Rather, his objection goes to the conduct of the hearings, and, in particular, to the actions of those persons who presided at the hearings, which resulted in frustrating his attempt to present a full explanation of his version of the incident.

Defendants concede that *Gray* and *Tyrrell* correctly set forth the applicable due process standard for prison disciplinary proceedings. They argue, however, that the facts in this matter establish compliance with those standards. Specifically, defendants assert that if plaintiff was cut off during each of the hearings, this was done only to prevent plaintiff from repeatedly denying his involvement in any misconduct. The evidence before us suggests that defendants' actions were not only premature, but effectively denied plaintiff his right to be heard.

*Plaintiff testified, in his deposition, that the defendants would not allow him to make any statement in response to the charges directed at him, except for bareface denials of those charges.* With reference to the first hearing, counsel for plaintiff adduced the following responses from plaintiff:

Q. Were you given an opportunity to explain what had happened?

A. Every time I try to say something I ask a question I would get cut off.

Q. Who cut you off?

A. The lieutenant and then this other Negro social worker.

Q. How many times did this happen?

A. This happened about five or six times.

. . . . .

Q. What would you explain had you been given the opportunity?

A. I explaining to them that I didn't know it was an unauthorized block or anything.

Deposition of Isiah Mack, at pp. 7–8.

Plaintiff's testimony was not shaken on cross-examination. Defense counsel elicited the following responses:

Q. All right. You testified that one of the lieutenants who was running the behavior clinic kept you from making a statement.

A. Everytime I try to make a statement he cut me off.

Q. What were you trying to say that he cut you off from saying?

A. Trying to tell him I didn't commit these crimes.

Q. You had already told him this; isn't that true?

A. Yeah, but this is all I could tell him.

Q. *In other words, you denied the allegations and then he wouldn't let you say anything else.*

A. *That's right.*

*Id.*, at pp. 25–26 (emphasis supplied).

Concerning the second hearing, on August 31, 1973, plaintiff testified again that he was not allowed to give a full explanation of his conduct, that he was cut off every time he tried to say anything, and that this occurred seven or eight times. *Id.*, at pp. 9–10.

*Contrary to the assertions of defendants, we find that the questions which were put to plaintiff at the hearing were merely conclusory inquiries in which he was directed either to admit or deny guilt without any adequate opportunity to explain his side of the story.* No affidavits or depositions have been submitted to contradict plaintiff's testimony, as required by F.R.Civ.P. 56(e).[10]

**10.** Both plaintiff and defendants rely on the same portions of plaintiff's deposition testimony relating to the conduct of the hearings in their cross-motions and briefs for summary judgment. The only evidence submitted by defendants which can in any way be viewed as contradicting plaintiff's deposition testimony is contained in the answers to interrogatories submitted by defendant Godfried. He asserts that although he was present at the August 20

Thus, we do not have any question of material fact with respect to his lack of opportunity to tell his version of the incident, either at the first clinic session, or at the review hearing.

In *United States ex rel. Jones v. Rundle,* 358 F.Supp. 939 (E.D.Pa.1973), a case decided several months *prior* to the hearings in this case, the late Judge Body held, under almost identical circumstances, that

> The most flagrant violation of the plaintiff's rights was the refusal to allow him to give his side of the story at the Clinic. In view of the findings of fact based on plaintiff's testimony uncontradicted by the State, the conclusion that the hearing was not fundamentally fair or rational is inescapable. One-sided hearings can be neither rational nor fair.

*Id.,* at 944 (emphasis supplied). Under the law, and based on the specific facts before us, we find that plaintiff's civil rights were indeed violated by the frustration of his attempts to "give his side of the story".

*(b) Right to call witnesses*

 Plaintiff also argues that his constitutional rights were violated by the refusal of defendants to allow plaintiff to call witnesses in his own behalf at the August 31 hearing. There is no absolute constitutional requirement that an accused in a prison disciplinary proceeding be allowed to call witnesses in support of his claims. In *Wolff v. McDonnell, supra,* the Supreme Court held that the desirability of allowing

an inmate to call favorable witnesses must be balanced against the hazards to institutional safety such a practice might entail. As we noted previously, however, the rights recognized by the Supreme Court in *Wolff* were specifically held not to be retroactive. The controlling legal principles during the time frame involved in this case are those enunciated by the Court of Appeals for the Third Circuit in *Braxton v. Carlson,* 483 F.2d 933 (3d Cir. 1973). In *Braxton* the Court of Appeals stated that

> The balance of appellants' contentions involve claims that further due process procedures should be required in Adjustment Committee hearings; i. e., . . . presentation of favorable witnesses, . . . .. We agree with appellants that the thrust of each of these procedural devices might improve the fact-finding function of the Adjustment Committee, but, in light of the sensitive needs of prison discipline, limited resources, and the proceeding's related goal of rehabilitation, we do not find that due process mandates their use.

*Id.,* at 941. Accordingly, we hold that plaintiff's constitutional rights were not violated in this case by the defendants' refusal to allow plaintiff to call witnesses in his own behalf at the August 31 hearing.[11]

*2. The Defense of Immunity*

 The defendants argue that even if we find that plaintiff's constitutional rights were violated at the August 20 and 31 hearings, they should be immunized from

---

hearing, he was not a voting member of the committee. In light of the uncontradicted assertion by plaintiff that the hearing was *conducted* by Godfried (deposition, at p. 6), and that Godfried and the "social worker" were primarily responsible for the refusal to allow plaintiff to explain his actions (deposition, at pp. 7–8), and in view of the fact that Godfried's name appears on the Behavior Clinic report as a member of the clinic recommending disciplinary action (plaintiff's exhibit 1, submitted with Motion for Summary Judgment), we do not view Godfried's assertion that he did not vote on the matter as material. The only evidence in this case relating to the *actual* conduct of the hearings is plaintiff's deposition. In that regard, it stands uncontradicted by anything submitted by defendants.

11. We need not decide whether the conduct of defendants in refusing to hear plaintiff's witnesses would have been proper under present due process standards. The uncontradicted evidence in this case is that plaintiff asked the defendants present at the August 31 hearing to call several witnesses in his behalf. The accusing officer, Bauk, responded, "[A]in't no use getting his witness. [sic] They gonna say that he didn't do it." Deposition of Isiah Mack, at p. 35. The question of whether this type of response constitutes an appropriate balancing of interests, as called for in *Wolff v. McDonnell, supra,* is not before us. We hold only that under the pre-*Wolff* standards applicable in this case, the defendants were justified in refusing to call plaintiff's witnesses, regardless of the reasons for their refusal.

liability because their actions in the conduct of the hearings involved the performance of discretionary functions.

In *Johnson v. Anderson,* 420 F.Supp. 845 (D.Del.1976), the court held, in the context of prison disciplinary proceedings, that

[i]n order to avail himself of official immunity, an official of the executive branch of government, even though charged with a constitutional violation arising from the exercise of a discretionary function, must establish:

1. *that he acted without malice and without actually realizing that his conduct would violate the plaintiff's rights;* and

2. that if he did not subjectively know that he was violating plaintiff's rights, *his failure to know about those rights was not unreasonable under all of the surrounding circumstances. Skehan v. Board of Trustees,* [538 F.2d 53 (3d Cir. 1976) (en banc)].

*Id.,* at 847 (emphasis added). The burden of going forward with evidence and of proving that official immunity should attach is on the defendants. *Skehan v. Board of Trustees, supra,* 538 F.2d at 61–62. See also, *Fidtler v. Rundle,* 497 F.2d 794, 801–02 (3d Cir. 1974).

Thus, even if we assume, *arguendo,* that defendants were engaged in the performance of discretionary functions while participating in the hearings in this case, it does not follow automatically that the defendants are entitled to immunity. The defendants must affirmatively establish the existence of a subjective *and* objective good faith belief that their conduct of the hearings in question was proper. This they have utterly failed to do. As we noted, *supra,* at footnote 1, this matter is before us as a case stated, by agreement of counsel. The parties were directed, by our Order of November 12, 1974, to supply us with "all

materials necessary for the decision of this case" by February 1, 1975. Although this deadline was later extended at the request of all counsel, the defendants have never submitted any evidence to support an allegation that they acted with the subjective good faith belief that what they were doing was proper. There is, therefore, a total absence of the kind of record necessary to support a finding of official immunity. Accord, *Smith v. Wendell,* 390 F.Supp. 260, 263 (E.D.Pa.1975) (defense of immunity rejected where defendants offered no affidavits or other documentation in support of the defense, and the record was devoid of any pertinent evidence concerning the applicability of the defense).

Additionally, we find, on the record before us, that such a subjective good faith belief would have been unreasonable as a matter of law. We note first, that on May 10, 1973, more than three months prior to the hearings in this case, Judge Body found that a hearing before a Behavior Clinic at the same institution involved in this case was woefully inadequate, on virtually identical facts. *United States ex rel. Jones v. Rundle,* 358 F.Supp. 939 (E.D.Pa.1973).[12] Second, as the court noted in *Johnson v. Anderson, supra,*

At least by August 14, 1972, when *Gray v. Creamer,* 465 F.2d 179 (3d Cir. 1972) was decided, the Third Circuit Court of Appeals had clearly established the rule for this Circuit that inmates in plaintiffs' position must be afforded the opportunity to tell their side of the story.

420 F.Supp. at 850.

Thus, even if evidence were produced to show that defendants were not aware that their conduct might be infringing on the constitutional rights of plaintiff, it is absolutely clear that they should have known that their conduct was improper. Accord-

---

12. In *Jones* the court found that

At the [hearing] the usual procedures were followed except the plaintiff, Sheridan R. Jones, and John Vann were not permitted to explain their actions. At the trial John Vann testified that they were not permitted to speak at all, and Sheridan R. Jones testified

that he tried to speak, got one sentence out, and then was cut off.

358 F.Supp. at 943. As we noted, *supra,* at p. 1146, the court found explicitly that these actions were flagrant violations of plaintiff's constitutional rights.

ingly, we find that the second element of the defense of immunity, the reasonableness of defendants' good faith belief in the propriety of their actions is also absent.

### B. The Transfer to Huntingdon

■ Plaintiff also complains that he was transferred to Huntingdon on the day the disciplinary period imposed upon him was due to expire; he asserts that the purpose and effect of the transfer was to confine him in segregation for an additional period of time, and that this was accomplished for punitive motives. He contends that his constitutional rights were violated by this transfer. We disagree.

The recent decision of the Supreme Court in *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), and its companion case, *Montayne v. Haymes,* 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976), are controlling. In *Meachum,* the Court held that

The initial decision to assign the convict to a particular institution is not subject to audit under the Due Process Clause, although the degree of confinement in one prison may be quite different from that in another. The conviction has sufficiently extinguished the defendant's liberty interest to empower the State to confine him in *any* of its prisons.

Neither, in our view, does the Due Process Clause in and of itself protect a duly convicted prisoner against transfer from one institution to another within the state prison system. Confinement in any of the State's institutions is within the normal limits or range of custody which the conviction has authorized the State to impose. That life in one prison is much more disagreeable than in another does not in itself signify that a Fourteenth Amendment liberty interest is implicated when a prisoner is transferred to the institution with the more severe rules.

*Meachum, supra,* 427 U.S. at 224–225, 96 S.Ct. at 2538, 49 L.Ed.2d at 459.

The crucial factor in *Meachum,* in the Court's view, was that under state law, the prisoner had no recognizable right to be incarcerated in any particular institution. Thus, there was no basis for identifying any liberty interest which could be subject to constitutional protection. *Id.,* at 225–260, 96 S.Ct. at 2538–2539, 49 L.Ed.2d at 460.

In the present case, there is no evidence that plaintiff's transfer was motivated by malice or ill will; indeed, the only indication of any reason for the transfer is that contained in defendant Johnson's written request for transfer, in which he stated that "[t]ransfer to State Correctional Institution Huntingdon is requested in this case to relieve the overcrowded conditions in our B.A.U." (Letter from Robert Johnson to Philip Bannon, September 19, 1973, attached as Exhibit 6 to Plaintiff's Motion for Summary Judgment).

■ Plaintiff's own deposition, read in a light that is favorable to him, absolutely fails to establish any motive in Robert Johnson's decision to transfer him to Huntingdon, other than that of wishing to relieve overcrowding in the Behavior Adjustment Unit at Graterford. Such a decision is clearly authorized under Pennsylvania law.[13] While it may be unfortunate that the plaintiff was serving the last day of his term in segregation at the time of the transfer, there is not a single fact in the record before us which would support a finding that the transfer in this case was not authorized under state law. We therefore hold, under the principles enunciated in *Meachum* and *Montayne,* that the transfer from Graterford to Huntingdon did not violate any of plaintiff's constitutional rights.[14]

---

13. *See,* 61 P.S. § 72, authorizing inter-institutional transfers where the transferor institution cannot "by reason of overcrowded condition or other existing conditions, furnish proper and sufficient accommodations for the care, custody, control, and safety of the inmates thereof, . . .."

14. Plaintiff's further contention that the recommendation by defendant Robert Johnson that plaintiff be retained in segregation at Huntingdon until a change in status was found to be warranted violated his constitutional rights is also without merit. First, it was just that—a *recommendation* which was not in any way

## C. Continued Segregation at Huntingdon

Plaintiff's final contention is that his continued segregation at Huntingdon from September 19, 1973 to October 5, 1973 without a hearing or sufficient cause, violated his civil rights.

Upon his arrival at Huntingdon on September 19, 1973, plaintiff was placed in segregation. On September 21, 1973 he was interviewed by defendants Dennis Erhard and Major William Johnson. Mr. Erhard was the Deputy Superintendent for Treatment, and Major Johnson was Acting Deputy of Operations. The interview was for the purpose of determining placement of plaintiff within the prison. At that time his records were unavailable, and these defendants had only a note about his misconduct in their file. Plaintiff informed them that he had served his time, but they did not have official verification of that fact, or of the reasons for the punishment. Plaintiff claims that the continued segregation violated his due process rights. Again, we cannot agree.

The normal procedure, which was followed in this case, of placing every new inmate who is transferred from another facility in administrative segregation until such time as an independent evaluation may be made of the appropriate treatment for and placement of the particular individual, is not only satisfactory from a constitutional viewpoint, see *Bauer v. Sielaff,* 372 F.Supp. 1104, 1111–12 (E.D.Pa.1974), but also a prudent exercise of judgment in connection with the maintenance of security. No discrimination is involved in such a practice, nor is any alleged in this matter.

Moreover, the delay in receipt of the records cannot itself be elevated to the level of a deprivation of civil rights. Indeed, plaintiff acknowledged in his deposition that he was actually released to the general population on October 5, 1973, even though his records had not yet been received at Huntingdon. Deposition of Isiah Mack, at 46–47. Thus the facts before us are almost identical to the facts alleged in *Bauer, supra*; there plaintiff was placed in segregation on his transfer to Graterford on December 1, was not interviewed within the normal two or three day period because his records had not yet arrived, and finally was interviewed and placed in the general population on December 7, although his records had sill not arrived.

We therefore conclude that plaintiff's continued segregation at Huntingdon from September 19 to October 5, 1973 did not violate his constitutional rights.

## III. DAMAGES

Perhaps the most difficult part of our task in this case is the determination of what monetary award, if any, is appropriate, given the constitutional violations which we have found. We start with the premise that "Courts may award compensatory damages to plaintiffs who are deprived of constitutional rights." *Farber v. Rizzo,* 363 F.Supp. 386, 398 (E.D.Pa.1973), and that "[t]he value of such rights, while difficult of assessment, must be considered great." *Id.*

Damages which may be awarded fall into three categories of monetary awards: *FIRST,* actual damages, including out-of-pocket, or pecuniary losses, as well as compensation for physical and mental suffering; *SECOND,* nominal damages, when no actual damages were sustained; and *THIRD,* punitive damages, when appropriate under applicable judicial standards. *Wilson v. Prasse,* 325 F.Supp. 9, 15 (E.D.Pa. 1971) aff'd. 463 F.2d 109 (3d Cir. 1972).

Plaintiff, in his amended complaint, dropped his claims for punitive damages and we would not, in any event, find them to be appropriate on the record before us.

---

binding on the receiving institution. Second, it was entirely appropriate for Warden Johnson to advise the receiving institution of his recommendations for treatment of plaintiff. Finally, as noted, *infra,* at p. 1149, transferred prisoners are, as a matter of course, segregated at the outset, until a determination is made as to appropriate treatment for and placement of the inmate.

We find, however, that plaintiff is entitled to an award of actual or compensatory damages.[15]

■ The final matter to be resolved, therefore, is the amount of our damage award. This troublesome problem has been handled in a variety of ways by the Courts. In *Sostre v. Rockefeller*, 312 F.Supp. 863 (S.D.N.Y.1970), rev'd in part, *sub nom.*, 442 F.2d 178 (2d Cir. 1971), *cert. denied*, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972), plaintiff was subjected to segregated confinement without a due process hearing under conditions involving severe physical deprivations, needless degradation, loss of rehabilitative work opportunities, loss of wages, loss of schooling and training opportunities, loss of self-improvement through reading, etc., and great mental anguish. The Court awarded plaintiff $25.00 per day for 372 days spent in segregation, for a total of $9,300 in compensatory damages. The Court of Appeals reversed the additional award of $3,270 in punitive damages on the ground that the evidence was not sufficient to support a finding of the requisite pattern of misbehavior on the part of the prison officials to sustain such an award. The Court found, however, that the award of $25.00 per day compensatory damages was reasonable, but held that those damages could not be assessed against the named defendant since he was not a participant in the wrongful conduct perpetrated by his predecessor.

In *Wright v. McMann*, 321 F.Supp. 127 (N.D.N.Y.1970), aff'd in part, 460 F.2d 126 (2d Cir. 1972), the District Court awarded a prisoner a flat $1,500.00 in compensatory damages for his confinement, completely nude, in an isolation cell stripped of all furnishings on several different occasions, for several days at a time. The Court of Appeals sustained the monetary award. *See*, also, *United States ex rel. Larkins v. Oswald*, 510 F.2d 583 (2d Cir. 1975) (jury verdict of $1,000.00 for 12 days of solitary confinement); *United States ex rel. Neal v. Wolfe*, 346 F.Supp. 569 (E.D.Pa.1972) ($25.00 per day for 16 days of solitary confinement plus $0.60 per day for 191 days lost wages caused by a change in job status resulting from the illegal confinement).

Based on the uncontradicted evidence before us, we conclude that plaintiff has been injured in the following particulars, as a result of defendants' failure to provide plaintiff with a constitutionally adequate due process hearing: FIRST, plaintiff was illegally confined in a segregation cell from August 20, 1973 to September 19, 1973, a period of 30 days; SECOND, plaintiff was deprived during that 30 day period, of the benefit of Bureau of Vocational Rehabilitation training which he was receiving in the field of electronics; THIRD, plaintiff was deprived of the benefit of substantial exercise during his illegal confinement, restricted as he was to only one ten minute walk in the yard, once a day, in contrast to the normal exercise period he would have enjoyed; FOURTH, plaintiff's wages from his work in the electric shop, amounting to $0.50 a day were cut off during his illegal confinement; FIFTH, and perhaps most important, during the 30-day period of solitary confinement, plaintiff was subjected to severe mental suffering and anguish. Deposition of Isiah Mack at pp. 14–16.[16]

■ Obviously, there is not, and cannot be any precise formula for calculating dam-

---

15. We note, in this connection, the recent decision of the Third Circuit Court of Appeals in *United States ex rel. Tyrrell v. Speaker*, 535 F.2d 823 (3d Cir. 1976), holding that because the plaintiff in that case was not actually harmed by his transfer to less restrictive facilities, only nominal damages in the sum of $1.00 were awardable. Because the plaintiff in this case was transferred to facilities which were considerably more restrictive, as a result of the inadequate disciplinary hearings, and, indeed, suffered actual monetary loss, see discussion, *infra*, at p. 1150, we conclude that nominal damages, under *Tyrrell* standards, would not be appropriate.

16. Since this matter was, with the agreement of the parties, submitted as a case stated, *supra*, footnote 1, and the parties were directed to furnish us with "*all* materials necessary for the decision of this case" (Supplemental Pretrial Order of November 12, 1974), the record before us is also complete with respect to the damage issue.

 

ages. At best, courts in grappling with this issue, can only arrive at a damage figure which represents a judgment based upon considerations of equity, reason and pragmatism.

We find that the method utilized by the Courts in *Sostre v. Rockefeller,* supra, and *United States ex rel. Neal v. Wolfe,* supra, of assessing damages on a per diem basis, is, for want of a better method, the most sensible and satisfactory system a Court can use in the calculation of damages; we further find that the sum of $25.00 per day is a reasonable per diem figure.

We will therefore award the plaintiff the sum of $765.00 as compensatory damages for the injuries which he sustained as a result of defendants' conduct. This figure is calculated at the rate of $25.00 per day for 30 days of confinement, plus $0.50 per day in lost wages over the same 30 day period. Since Harry Godfried was the only defendant present at the August 20, 1973 hearing, we find him solely responsible for the first 11 days of plaintiff's improper confinement, for which we award plaintiff $280.50. Walter Smith, Daniel Sims, and Richard Parcell were participants in the August 31, 1973 hearing. We find these three defendants, along with defendant Godfried, jointly and severally liable in the amount of $484.50, the amount of compensatory damages for the remaining 19 days of unconstitutional confinements to which plaintiff was subjected.

An Order will issue accordingly.

### ORDER

AND NOW, this 21st day of April, 1977, for the reasons set forth in the foregoing Opinion, it is hereby ORDERED, ADJUDGED AND DECREED that in connection with the cross-motions for summary judgment in this matter, plaintiff's motion for summary judgment is DENIED as to defendants Robert Johnson, Dennis Erhard, and William Johnson, and is GRANTED against defendants Walter Smith, Daniel Sims, Harry Godfried and Richard Parcell, jointly and severally, in the amount of $484.50, and against Harry Godfried, alone, in the additional amount of $280.50.

It is FURTHER ORDERED, ADJUDGED AND DECREED that defendants' motion for summary judgment is GRANTED as to defendants Robert Johnson, Dennis Erhard and William Johnson; that the complaint is DISMISSED as to those defendants; and that the motion is DENIED as to defendants Walter Smith, Daniel Sims, Harry Godfried and Richard Parcell.